BARCLAYS CAPITAL INC., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Morgan Stanley & Co. Incorporated, Plaintiffs,

v.

THEFLYONTHEWALL.COM, Defendant.

No. 06 Civ. 4908(DLC).

United States District Court, S.D. New York.

March 18, 2010.

Opinion Denying Stay or Modification of Injunction May 7, 2010.

R. Bruce Rich, Benjamin E. Marks, Jonathan Bloom, Jackson Wagener, Weil Gotshal & Manges LLP, New York, NY, for Plaintiffs.

Glenn F. Ostrager, Joshua S. Broitman, Dennis M. Flaherty, Roberto Gomez, Ostrager Chong Flaherty & Broitman P.C., New York, NY, for Defendant.

## OPINION & ORDER

DENISE COTE, District Judge:

This litigation confronts the phenomenon of the rapid and widespread dissemination of financial services firms' equity research recommendations through unauthorized channels of electronic distribution. This dissemination frequently occurs before the firms have an opportunity to share these recommendations with their clients—for whom the research is intended—and to encourage the clients to trade on those recommendations. The firms contend that their recommendations are "hot news" and that the regular, systematic, and timely taking and redistribution of their recommendations constitutes misappropriation, which is a violation of the New York common law of unfair competition.

Barclays Capital Inc. ("Barclays Capital"), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), and Morgan Stanley & Co. Inc. ("Morgan Stanley") (collectively, the "Firms") have brought suit against defendant Theflyonthewall.com, Inc. ("Fly"). Fly is an internet subscription news service that aggregates and publishes research analysts' stock recommendations along with many other items of varying interest to investors. In addition to asserting hot-news misappropriation, the Firms accuse Fly of infringing the copyrights of Barclays Capital and Morgan Stanley in seventeen research reports released in February and March 2005. For the reasons described below, judgment shall be entered for the plaintiffs on both claims.

This action was originally filed on June 26, 2006 by Lehman Brothers Inc. ("Lehman Brothers"),[1] Morgan Stanley, and

---

1. In 2008, Barclays Capital acquired Lehman Brothers' North American investment bank-

Merrill Lynch[2] and assigned to the Honorable George B. Daniels. Fly answered on August 16, 2006 and asserted counterclaims for defamation, tortious interference with prospective business relations, and unfair competition under § 43(a) of the Lanham Act. Those counterclaims were dismissed on March 15, 2007. Following a lengthy period reserved for settlement negotiations, fact discovery closed on or about December 19, 2008.

The case was reassigned to this Court on June 8, 2009. The Firms and Fly each filed motions for summary judgment on May 18, 2009, which became fully submitted on August 11, 2009. Thereafter, the Firms advised that they would voluntarily waive their claims for damages to the extent that such claims would entitle any party to a jury trial. On September 3, Fly acknowledged that the parties were not entitled to a jury trial. The summary judgment motions were denied on November 6, 2009, and the case was set down for a bench trial.

With the parties' consent, the trial was conducted in accordance with the Court's Individual Practices. In advance of the March 8 trial date, the direct testimony of the witnesses was presented through affidavits submitted with the joint pretrial order along with the parties' trial exhibits. The Firms presented the affidavits of Barry Hurewitz, Chief Operating Officer of Investment Research at Morgan Stanley ("Hurewitz"); Stuart Linde, Global Head of Equity Research at Barclays Capital and former U.S. Director of Equity Research at Lehman Brothers ("Linde"); Kathleen Lynch, Chief Operating Officer for the Global Research Group at Merrill Lynch ("Lynch"); and Candace Browning, President of Global Research at Merrill Lynch ("Browning"). Fly presented affidavits from Ron Etergino, President and majority owner of Fly ("Etergino"); Kellie Berg Garfunkel, a news reporter for Fly ("Garfunkel"); Jay Mahr, a news editor for Fly ("Mahr"); and Margaret Muldoon, a marketing consultant for Fly ("Muldoon"). Of the Firms' witnesses, all four appeared at trial and were available for cross-examination. Plaintiffs also called Etergino as an adverse witness on their case-in-chief. Of the defendant's witnesses, Etergino, Garfunkel, and Mahr appeared at trial and were available for cross-examination. The parties accepted Muldoon's affidavit by stipulation. Etergino also demonstrated the functionality of Fly's website as part of the defendant's case-in-chief.

Four pretrial motions were filed. First, the Firms moved *in limine* to preclude the admission of testimony under Fed.R.Civ.P. 37(c)(1) by a third-party witness, Kevin Reynolds, on the basis that Fly had failed to make proper discovery disclosures concerning Reynolds as required by Fed. R.Civ.P. 26(a)(3)(A)(i).[3] The parties stipu-

---

ing, capital markets, and equity research businesses and became vested with all of Lehman Brothers' intellectual property interests in its preexisting equity research, and promptly relaunched Lehman Brothers' U.S. trading and research operations under the Barclays Capital name. On November 19, 2008, Barclays Capital moved to substitute itself for Lehman Brothers as a plaintiff in this action, and this motion was granted and the caption amended on March 19, 2009.

2. On January 1, 2009, Merrill Lynch was acquired by Bank of America Corporation.

Since that date, all U.S. equity reports generated by Merrill Lynch have been branded as "Banc of America Securities–Merrill Lynch" research or as "BofA Merrill Lynch" research.

3. Reynolds and his current employer, Bloomberg L.P. ("Bloomberg"), also moved successfully to quash the trial subpoena served on Reynolds.

lated to three of the four facts that Fly sought to elicit from Reynolds, and the motion to preclude was granted as to the fourth. Second, Fly moved *in limine* to preclude certain direct testimony proffered by the Firms on the grounds that it was irrelevant, hearsay, and/or improper lay opinion testimony. That motion was granted to the extent indicated on the record at the final pretrial conference and otherwise denied. Finally, Fly's motion for judgment on partial findings on the hot-news misappropriation claim, and Fly's motion to preclude evidence concerning its prior lawsuit for copyright infringement and hot-news misappropriation against its competitor TradeTheNews.com ("TTN"), were each denied.

This Opinion constitutes the findings of fact and conclusions of law following the March 8–11, 2010 bench trial. The factual findings are principally set forth in the first section of this Opinion, but appear as well in the final section.

### FINDINGS OF FACT

### I. The Firms' Equity Research Business Model

The Firms are major financial institutions that provide wealth and asset management, securities trading and sales, corporate finance, and various investment services. Collectively, their customers include large institutional clients, foundations, corporations, businesses of every size, families, and individuals. Among their clients of particular importance to the issues in this litigation are U.S. hedge funds, private equity firms, money managers, mutual funds, pension funds, and wealthy individual investors. The services that the Firms offer their clients, including research reports, financial analytics, and trading tools, support clients' investing activities and are intended to assist with maximizing their returns on those investments. One principal source of revenue for the Firms is the commissions earned when they facilitate trading on behalf of their clients.

The development and marketing of research about major publicly traded equity securities, or "equity research," is a critical component of each Firm's business model. It is a foundational element of the relationship between the Firms and their most significant clients. The Firms use their equity research—and their reputations for creating reliable and valuable advisory reports based on that research—to attract and retain clients, to entice clients to execute trades through them, and to differentiate themselves from other financial services firms.

### A. Content of Equity Research Reports

The Firms' equity research reports may be company-specific, industry-wide, or macroeconomic in focus, and may range from a single page to hundreds of pages in length.[4] The Firms' company-specific research reports may include projections of future stock prices, judgments about how a company will perform relative to its peers, and conclusions about whether investors should buy, sell, or hold stock in a given company. Each Firm maintains its own rating system to indicate whether analysts believe the price of a stock is likely to increase, decrease, or remain relatively

---

4. The Securities Exchange Act of 1934, as amended by the Sarbanes–Oxley Act of 2002, defines a "research report" as "a written or electronic communication that includes an analysis of equity securities of individual companies or industries, and that provides information reasonably sufficient upon which to base an investment decision." 15 U.S.C. § 78o–6(c)(2). *See also* SEC Regulation Analyst Certification ("Regulation AC"), 17 C.F.R. § 242.500 (2005).

steady.[5] Each of the Firms issues scores and sometimes even hundreds of research reports in a single day. Only a small fraction of reports, however, are "actionable" in the sense that they are likely to spur any investor into making an immediate trading decision. The actionable reports are those that upgrade or downgrade a security; begin research coverage of a company's security (an event known as an "initiation"); or predict a change in the security's target price.

While the actionable reports, which the parties and this Opinion will refer to as Recommendations, are issued around the clock, the vast majority of them are issued between midnight and 7:00 a.m.[6] Recommendations may move the market price of a stock significantly, particularly when a well-respected analyst makes a strong Recommendation. Such market movement usually happens quickly, often within hours of the market opening following the Recommendation's release to clients. Thus, timely access to Recommendations is a valuable benefit to each Firm's clients, because the Recommendations can provide them an early informational advantage.

Each Firm also produces summaries of its company-specific reports that include, in aggregated form, the actionable elements (such as the Recommendations and brief commentary) of the research reports released by the Firm overnight or early that morning. For example, Barclays Capital provides a "Morning Meeting" flash summary and a "Before the Bell" report, each of which includes the Recom-

mendations the Firm released that morning.

## B. Production of Equity Research Reports

Each of the Firms devotes substantial resources to the production of their equity research reports. Each has hundreds of employees devoted full-time to the production of original equity research, and each invests hundreds of millions of dollars per year in creating the research. For example, Merrill Lynch's Global Research department covers approximately 3,200 stocks across 48 different industries and issues approximately 40,000 equity research reports per year. In addition, each Firm calls upon its analysts to undertake other activities as well, such as participating in conference calls, interfacing with clients, and hosting corporate access events. The preparation of research reports, however, is at the core of everything that the research departments at the Firms do.

The work done by the analysts to prepare equity research reports at each Firm is broadly similar. The analysts typically specialize by following particular industries, companies, and/or countries or geographic regions. The creation of research reports is a time-consuming endeavor. To carry out their work, analysts gather company-specific and industry-wide financial results; visit a company's facilities; build and maintain relationships with sources of information, including salespeople, corporate representatives, traders, clients, experts, and fellow analysts; conduct sur-

---

**5.** As one example, Linde testified regarding Barclays Capital's rating system:

> Stocks are given one of three ratings: a rating of "1–overweight" indicates that the stock is expected to outperform the companies in the sector coverage universe over a 12–month investment horizon; a rating of "2–equal weight" indicates that the stock is

expected to perform in line with the sector coverage universe over a 12–month investment horizon; and a rating of "3–underweight" indicates a below-average return.

**6.** All times in this Opinion should be understood to refer to Eastern Time.

veys of customers and competitors; track industry and economic trends; assess relative stock valuations; create and update financial models; synthesize the gathered data; make quantitative projections about future earnings, cash flow, balance sheet items, and stock valuations; draw conclusions; and, finally, collaborate with team members to arrive at a formal Recommendation. The Firms' analysts must also exercise judgment in determining when to initiate or terminate research coverage of a particular company, how often to issue new reports, and when to change the rating, target price, or other investment advice for a given security.

The Firms are widely recognized for their expertise and reputation in the field of equity research. All three Firms have been recognized by industry observers such as *Institutional Investor* for their research quality, with Lehman Brothers and its successor Barclays Capital being named the top U.S. equity research team every year from 2002 through 2009.

## C. Distribution of Equity Research Reports

Each of the Firms maintains sizable client bases that act as consumers of their research and expends substantial resources to disseminate their research to those clients. For example, Morgan Stanley has approximately 7,000 institutional investor clients and close to 100,000 individual investors who receive regular access to its research reports. A single sophisti-cated client, such as a hedge fund or mutual fund, may have many employees who receive a copy of the Firms' research reports; thus, for the 7,000 institutional accounts at Morgan Stanley, a total of 125,-000 "contacts" are collectively authorized to receive research. Thus, Hurewitz estimated at trial that approximately 225,000 separate people have full entitlement to receive research reports from Morgan Stanley. Millions more Morgan Stanley retail clients can also gain access to its research by requesting specific reports from their Financial Advisor. Aside from distributing their own research, the Firms are not otherwise involved in the business of reporting or distributing financial or business news.

As is explained below, each Firm has a system for determining which clients are allowed to receive the Firm's full set of research reports and Recommendations. The Firms distribute their research reports to these "entitled clients" through several authorized channels.

First, entitled clients are granted access to password-protected proprietary internet platforms, separately maintained by each Firm, to which the research reports are posted.[7] Second, to serve clients who wish to consolidate on one platform all of the research to which they are entitled from multiple sources, each of the Firms also licenses third-party distributors to disseminate their research. Such licensed distributors, which vary from Firm to Firm, include Bloomberg, Thomson Reu-

---

7. Lehman Brothers disseminated its equity research on the "LehmanLive platform"; Barclays Capital's successor platform is known as "Barclays Capital Live." Morgan Stanley's platform is known as "Research Link." Merrill Lynch maintains two internal systems through which clients may receive the Firm's research reports electronically. The first, "Research Subscribe," allows clients and Merrill Lynch trading personnel to receive the Firm's equity research via email distribution. The second, "MLX," allows clients and trading personnel to access the research online using a username and password. Following Bank of America's purchase of Merrill Lynch in 2009, Merrill Lynch research reports are also available through a Bank of America distribution platform similar to MLX and known as "BAS Portal."

ters, TheMarkets.com ("TMC"),[8] FactSet, and Capital IQ. For licensed distributors that also maintain their own financial news reporting businesses, such as Bloomberg and Thomson Reuters, the Firms require that the distributors maintain a "firewall" such that the media arm cannot obtain information from the research arm, although an end user may nevertheless receive both research and media content on the same physical interface.[9] The Firms also insist that the licensed distributors employ systems that ensure that a Firm's research reports are accessible only to that Firm's entitled clients. In recent years, the Firms have redoubled their efforts to manage "entitlements" on these third-party platforms so that no one can access their research through the licensed distributors that would not already have direct access through the Firms themselves. At each of the Firms, once an analyst releases a research report, it is delivered simultaneously to all authorized distribution channels, both internal and external, with the exception of an embargoed research market.[10]

The Firms also personalize the distribution of their research to a targeted subset of entitled clients. After the research reports have been distributed through the two channels described above, brokers and sales-traders at the Firms may email the research reports directly to certain entitled clients or disseminate their substance by instant message ("IM") or telephone.

The Firms also host private conference calls or "webcasts" in which their analysts discuss their research reports and Recommendations with Firm clients; access is restricted to those who have been given a call-in number or login and passcode.

This targeted and personalized outreach is at the heart of this case. The Firms have identified a small number of clients, principally institutional clients, on which they concentrate their analyst and sales outreach efforts. For example, roughly 200 of Morgan Stanley's thousands of institutional clients account for over two-thirds of the time and resources the Firm devotes to marketing its research. As noted above, any one of these 200 clients may have scores of contacts entitled to receive research, each of whom plays some role in the client's investment decisions, including the choice of which brokerage firm will receive their trading order.

The Firms' follow-up regarding their Recommendations with this targeted subset of clients is a highly orchestrated and intensive sales effort. Each of the Firms conducts a morning meeting at roughly 7:15 a.m., at which an analyst who has just released a significant Recommendation is given only three minutes to describe the Recommendation. This series of analyst presentations is delivered to the Firm's sales staff and concludes by 8:00 a.m. Armed with this new information—as well as their existing knowledge of their clients'

---

**8.** TMC is a consortium of sell-side brokers that consists of some 11 member firms. Like Bloomberg or Thomson Reuters, it serves as a research aggregator for the distribution of Firms' content to entitled clients of the respective member firms.

**9.** For example, Bloomberg delivers the Firms' research reports through the Bloomberg Terminal, which also can deliver to any Terminal user Bloomberg's own newsfeed (known as Bloomberg Market News) and any other

newsfeeds to which the user has separately subscribed.

**10.** On the "embargoed market," the Firms sell their research reports one to two weeks after their initial distribution to customers like law firms, management consulting firms, accounting firms, and academic institutions. The revenues earned from the sale of research on the embargoed market are comparatively modest, amounting to only a few million dollars per year or less.

needs and interests—the sales force calls, emails, and IMs clients in a sustained effort to reach their contacts at the targeted client base, recommend a trading strategy, and invite the client to place the trading order at the Firm. Most communications are very short; for example, each telephone contact may last anywhere from 90 seconds for a voicemail to five minutes, or longer, for a conversation. This activity is most intense from the hours of 8:00 a.m. to mid-day, but can extend over a two-day period for a particularly significant Recommendation. The Firms act with such alacrity and intensity because they believe that every second counts for many contacts in this target client base.

Thus, equity research at the Firms is not an independent, self-sustaining business, but rather, complements each Firm's brokerage and trading operations. Equity research reports are the Firms' intellectual capital, and their substantial investment in producing high-quality equity research is ultimately justified only by the role that research plays in driving commission revenue. The greater the perception of value, the more that clients are willing to pay to gain and retain access to that research by directing their trading business to the Firm.

The value of the research derives not just from its quality, however, but also from its exclusivity and timeliness. Some sophisticated clients, such as hedge funds, seek to act on the Recommendations before other investors do so. These sophisticated clients seek an advantage over other investors by relying on the high-quality analysis underpinning the Firms' Recommendations, anticipating market movement, and making rapid trading decisions. Such "short-horizon" investors are also the principal drivers of trading revenues for the Firms.

For other investors, with longer investment horizons, research reports retain value over hours, days, or even longer. Whatever a client's trading model, however, it is the Firms' experience that their clients are more likely to execute a trade through the Firm if they learn of the Recommendation directly from the Firm rather than from another source. As Lynch explained at trial, a client who learns of a Recommendation from a telephone call from Merrill Lynch often will decide to initiate a trade on the spot. Even those clients who learn about a Merrill Lynch recommendation through Merrill Lynch's internet distribution platform or one of its licensed outside vendors are expected to, and usually do, execute their trades through the Firm. Lynch and Browning estimated at trial that at least 60 percent of all trades conducted in their Firm's Global Wealth Management division are caused by Firm solicitations.

## D. Efforts to Control Access to Research

To wring the most value from their research, the Firms have worked hard in recent years to tighten control over who may view their research output. For example, the Firms limit full research access to only those clients who meet a certain threshold of annual revenue generation for the Firm, such as $50,000 or even $100,000. Clients who generate revenue below such thresholds may be authorized to receive some research, but not immediate and automatic access to the full universe of research reports. The Firms also periodically "scrub" the list of recipients entitled to receive research based on whether or not they have continued to direct sufficient business to the Firms. The Firms have communicated to their employees that the unauthorized dissemination of their equity research or its contents is a breach of loyalty to the Firm, undermines the Firm's creation of reve-

nue, and can result in discipline, including firing.

To further control the dissemination of the research, the Firms purport to forbid their clients from redistributing the Firms' research content. For example, research reports contain standard prohibitions, such as "[t]his report or any portion hereof may not be reprinted, sold or redistributed without the written consent of [the Firm]." Similar prohibitory warnings are placed on the Firms' distribution platforms and inserted into third-party license agreements. Those license agreements contain explicit contractual covenants against distribution to unauthorized parties, such as one Firm's contract with Bloomberg providing that "[t]he parties hereby agree that the Research Reports may only be distributed to those Users entitled by [the Firm] to receive the Research Reports" and that "Bloomberg . . . shall not, without the consent of [the Firm], disclose or make the Research Reports available to any persons other than approved Users and those Bloomberg employees with a need to know."

The media and communications policies at each of the Firms have been tightened in recent years to ensure that disclosure of Recommendations to the press does not undermine the ability of the Firms to generate trading revenue. At Morgan Stanley, research information is only distributed to the media on a case-by-case, limited basis, and even then only to those reporters who produce original content, use the Firm's research as context for a broader story, and maintain an ongoing relationship with the Firm's communications department. Similarly, Merrill Lynch only considers reporter requests to confirm stock Recommendations after 2 p.m. or, in the case of a Recommendation issued during the trading day, on a four-hour delayed basis, and only then in the context of a broader story containing original reporting and analysis.[11]

Finally, the Firms are working to exploit recent technological innovations in internet security in an effort to monitor and curtail the unauthorized dissemination of their research. As part of its "Intellectual Content Protection Initiative," Merrill Lynch conducts regular internet searches to locate instances of unauthorized redistribution of its research content. As part of this surveillance, the Firm aims to determine if unauthorized parties are using its private URLs to access Firm research, and if so, the Firm then disables those links.[12] Certain websites and social networking platforms are "blacklisted" so that Merrill Lynch URLs will not function on those websites. The Firm has also developed personalized, encrypted URLs for delivering research to clients, so that each client's usage can be individually monitored and any resulting abuse can be tracked, and the Firm has embedded vendor-specific "watermarks" into research reports so that the Firm can determine through which licensed distributor a leaked report had passed. Morgan Stanley monitors distribution leakage through a readership screening engine, watch list, and what it calls its Client Systems Analytics Team.

11. This represents a change from Merrill Lynch's previous, more lenient media policies, in which there was a one-hour and then a three-hour embargo on the release of research reports to media sources.

12. A URL, or Uniform Resource Locator, is the technical name for the internet address at which a particular web page or document may be found. For example, the URL for Fly's website is http://www.theflyonthewall.com. URLs can be devised in such a way that multiple, distinct URLs can nonetheless lead a user to the same ultimate destination.

E. The Firms' Frustrations Over Lack of Control

Even though the Firms have always tried to limit the distribution of their Recommendations to entitled clients, they do not dispute that many of their Recommendations leak from authorized channels and are then posted by online aggregators or reported as financial news in the mainstream media. This leakage became a noticeable phenomenon by 2004. In that year, they identified Fly as one of the most systematic unauthorized publishers of their Recommendations, and by 2005, the Firms had begun to take serious steps to address the problem of unauthorized redistribution of their Recommendations and research. Thus, many of the systems designed to control access to research reports and Recommendations that are described above were implemented or tightened in the years following 2004. In the last five years, each of the Firms has also invested substantial resources in studying how its research, and in particular its Recommendations, were being redistributed and how it could stop or impede that process.

The unauthorized redistribution of research reports and Recommendations has had another impact on the Firms. The Firms have cut their analyst staff and budgets significantly in the last five years because of their perception that equity research is no longer driving commission revenue as forcefully or consistently as it once had. With clients able to review the Firms' Recommendations and even research reports through other sources, the research departments have been handicapped in their ability to argue for their historical share of the Firms' overall budgets. Thus, with the decline in exclusivity of their research, the resources that the Firms have devoted to research production have declined. For example, the number of analysts in one Firm has been cut by 20 percent over the past five years, and the research budget at another has been cut in half over the past decade. At one of the Firms, the North America research team, which includes all research into U.S. stocks, has been scaled back even more dramatically. Because of these cuts, many companies' equities are no longer being covered by the Firms' analysts.

During this same period, of course, other factors have had an impact on the financial well-being of the investment firms in general and on their research budgets in particular. Since 2008, the world has experienced an economic cataclysm. Discount trading platforms have proliferated, which enable investors to buy or sell securities with cut-rate commissions. Moreover, in 2002, a joint investigation by the New York Attorney General and federal securities regulators uncovered widespread conflicts of interest among equity research analysts in major Wall Street firms. The resulting Global Research Analyst Settlement, finalized in April 2003, required ten major investment firms—including the plaintiff Firms—to pay approximately $1.4 billion in disgorgement and civil penalties.[13] In addition, based on various information unearthed by the joint investigation, dozens of class action lawsuits were filed by investors against the investment firms and litigated over the years that followed.[14]

---

**13.** *See* U.S. Securities & Exchange Commission, *Ten of Nation's Top Investment Firms Settle Enforcement Actions Involving Conflicts of Interest Between Research and Investment Banking,* Release No. 2003–54 (Apr. 24, 2003), *available at* http://www.sec.gov/news/press/2003–54.htm.

**14.** *See, e.g., In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347, 353–55 (2d Cir. 2010) (discussing the Global Research Analyst

While each of the above factors has undeniably had an independent impact on the health of the research departments at each Firm, the evidence at trial was compelling that the unauthorized redistribution of Recommendations has also been a major contributor to the decline in the resources that each Firm devotes to equity research. The reason for this is not hard to fathom; the investment in research is justified by its ability to drive commission income, and when that linkage is broken, the justification is greatly diminished.

One example will suffice. In May 2006, Merrill Lynch issued a Recommendation "contrary to the industry consensus" upgrading General Motors stock from "hold" to "buy." The basis of this contrarian call was the Firm's prediction that far more union-affiliated workers would accept the company's offer to buy out their contracts than was previously expected by most market observers. General Motors stock price rose approximately 30 percent following the release of Merrill Lynch's research report, and clients who traded promptly on that information earned a sizable return. Fly, however, had posted the upgrade on its site within minutes after Merrill Lynch released the Recommendation to its clients, and thus, before the Firm's sales professionals could reach their clients to inform them of the Recommendation.

It bears noting that it does not matter to the Firms whether the unauthorized distribution is through a small internet company like Fly or through media giants like Bloomberg, Thomson Reuters, or Dow Jones. The damage is caused not by the identity of the publisher, but by the timely and systematic unauthorized redistribution of the Firms' Recommendations, whatever the medium. To that end, through conference calls and face-to-face meetings with mainstream media, the Firms have objected to the systematic publication of their Recommendations. At least one mainstream publisher of financial news has represented that it is watching this litigation against Fly closely and will adjust its practices based on its evaluation of the outcome of this litigation. The Firms have also sent cease-and-desist letters to several of Fly's competitors in the online newsfeed niche market.

## II. Theflyonthewall.com

Fly is a New Jersey corporation that, since 1998, has been engaged in the business of collecting and publishing financial news, rumors, and other information flowing from Wall Street via its online subscription newsfeed, www.theflyonthewall.com.[15] Fly describes itself as a "single source internet subscription news service ... reporting relevant, market-moving financial news and information," including "the most comprehensive database of analyst trading calls, events, and syndicate information on the web." Emphasizing the timeliness of its reporting, it asserts that, as the "fastest news feed on the web," it delivers to its customers "actionable, equity news in a concise & timely manner." In the words of Fly's website, "[o]ur quick to the point news is a valuable resource for any investment decision."

In particular, Fly emphasizes its quick and comprehensive access to Recommendations made by Wall Street research analysts. It states that its newsfeed allows investors to "keep track of the latest Up-

Settlement and the business practices that had been subject to investigation); *Shah v. Meeker,* 435 F.3d 244, 245–47 (2d Cir.2006) (same); *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 164–67 (2d Cir.2005) (same).

**15.** Fly maintains offices in Summit, New Jersey; Queens, New York; and Argentina.

grade/Downgrade," and is a "one-stop solution for accessing analyst comments, directly sourced in a real time basis." As Fly advertises, "Theflyonthewall.com is designed to bridge the gap between Wall Street's big players 'in the know' and those who want into their club." Similarly, Fly asserts that "[h]aving a membership with the Fly is like having a seat at Wall Street's best houses and learning what they know when they know it." It brags that it posts "breaking analyst comments as they are being disseminated by Wall Street trading desks," "consistently beating the news wires." Indeed, its very name is intended to convey that it allows its subscribers to be a "fly on the wall" inside the investment firms' research departments.[16]

Fly's website contains an explicit disclaimer advising users that Fly staff are not brokers, dealers, or registered investment advisors. Nevertheless, Fly's marketing materials emphasize that its service is intended to assist investors. In Fly's words, by "[c]ombining industry experience, market acumen and extensive industry contacts, thelfyonthewall.com [sic] helps investors to make better informed investment decisions."

### A. Fly's Newsfeed

The cornerstone of Fly's business is its online newsfeed, which is updated continuously every day between 5:00 a.m. and 7:00 p.m. The newsfeed, which Etergino demonstrated at trial, presents a constant stream of "headlines"—on average, over 600 per day—in ten different categories. These categories include: "Hot Stocks," "Rumors," "Recommendations," "Conference/Events," "Syndicate," [17] "Options," "General News," "Periodicals," "Technical Analysis," [18] and "Earnings." Fly does not conduct its own equity research or include any original research in its newsfeed.

The headlines in one of these categories, "Recommendations," are the basis of this litigation. It is to this category that Fly posts the Recommendations by sixty-five investment firms' research analysts, including the three plaintiff Firms. A typical Fly headline from 2009 reflecting a Recommendation by one of the Firms is "EQIX: Equinox initiated with a Buy at BofA/Merrill. Target $110." On occasion, the headline is accompanied by a brief summary of the research report's reasoning, but with the commencement of this lawsuit Fly has generally not included such summaries for the plaintiffs' Recommendations. Etergino estimated at trial that approximately 80 percent of Fly's Recommendation headlines are posted before the 9:30 a.m. market opening each day. Fly has posted more than two dozen Morgan Stanley Recommendations, and up to ten Recommendations for both Merrill Lynch and Barclays Capital, in a single day before the opening of the market.

Fly has devised a software program that permits it to compose the headline quickly by tabbing through a few categories of

---

16. Etergino repeatedly tried to distance himself at trial from his company's marketing materials, describing their statements as "exaggerated" and "marketing fluff." Etergino did not deny, however, that Fly has held itself out to investors as the fastest, most comprehensive aggregator of analyst Recommendations on the internet. His company's internal training documents for its staff also contain substantially similar descriptions of Fly's goals and methodology.

17. The "Syndicate" category reports headlines about deals such as IPOs, spot secondaries, and block trades, which are assembled by groups of financial institutions.

18. The "Technical Analysis" category contains headlines concerning broad-based macro—or microeconomic information and its likely effect on future corporate performance.

information. For instance, it has a drop-down menu that permits it to indicate an upgrade or downgrade through a single keystroke. Another tabbed menu lists every investment firm covered by Fly and is automatically linked to each firm's recommendation system, so that the individual firm's evaluative descriptor can be quickly plugged into the headline. When Etergino makes an error in reporting a Recommendation, which he contends is rare, he blames it on a keystroke entry error and not on his newsgathering.

Within the "Conference/Events" category, Fly frequently posts call-in numbers and passcodes for conferences hosted by equity analysts at various Wall Street firms. Fly posted conference call-in numbers and passcodes at the Firms until 2008. The Firms never authorized Fly to post their Recommendations or these call-in numbers and passcodes. At trial, Etergino asserted that any posting of the Firms' conference calls after 2006 was inadvertent.

The user may filter information from the entire Fly newsfeed by selecting one or more categories of headlines. The "Recommendations" category and several other categories are also searchable, sortable, and viewable in different formats. Users may establish a "portfolio" of up to 150 different stocks through which they can automatically receive email, pop-up, or audio alerts whenever Fly posts content relevant to those stocks. Fly also provides an audio feed of headlines streamed through the internet, which it calls "FlyRadio."

The audio feed, also known as a "squawk box," runs silently in the background but is audible when there is news or information to be heard.

While Fly's initial growth can be attributed to its extensive and timely publishing of Recommendations by investment and brokerage firms, over time it has diversified the kind of information that it reports through headlines. Thus, Fly represents that while headlines about the three Firms' Recommendations accounted for roughly 7 percent of its overall newsfeed in 2005, as of 2009, only about 2.5 percent of Fly's total content consisted of the Firms' Recommendations.

Like the Firms, Fly disseminates its content both directly and through licensed distributors. Fly currently distributes its content to approximately 3,300 direct subscribers on its website and to another 2,000 subscribers who access its content through Fly's licensed financial content partners, such as Bloomberg, Thomson Reuters, and others, including AOL, NAS-DAQ, Acquire Media, and Wall Street Source.[19] Fly also distributes its newsfeed to eSignal, a trading platform, and to NewsWare, owned by the Track Data Corporation, which maintains its own broker/dealer and offers a service called My Track that combines live data streams with a brokerage platform. Additionally, at least of one Fly's former distribution partners, Cyber Trader, maintained an online discount brokerage platform and was asso-

**19.** Fly offers its newsfeed through the Bloomberg Terminal pursuant to a Third Party Contributor Agreement dated August 7, 2001. Under this agreement, Fly is provided with several Bloomberg Terminals with access to Bloomberg Market News; Fly pays Bloomberg an annual fee; and Fly receives a percentage of the additional subscription fee that Bloomberg charges Terminal users for access to Fly's newsfeed. Approximately 700 Fly subscribers access Fly through the Bloomberg Terminal. Fly also offers its newsfeed through Thomson Reuters, with whom it splits the additional subscription fees. Fly's relationship with AOL consists of Fly sending the latter three stories per day, including "recommendation wrap-ups," in exchange for a nominal payment per story.

ciated with the online brokerage firm, Charles Schwab.[20]

Fly's subscribers include individual investors, institutional investors, retail investors, brokers, and day traders. Subscriptions to Fly's website may be customized based on three content packages—"news," "events," and "syndicate"—and can be purchased on either a monthly or a yearly basis. Etergino estimated at trial that two-thirds of Fly's customers subscribe to all three of Fly's content packages, while the remaining one-third subscribe only to the "news" package, which includes the "Recommendations" category. The price to subscribe to all three packages is $50 per month or $480 per year, while the price to subscribe to just one package is $25 per month or $240 per year.

Fly has also established an RSS (really simple syndication) feed that distributes Fly's newsfeed headlines over various RSS readers, including Google, AOL, Yahoo!, and SkyGrid.[21] This RSS feed contains all of Fly's headlines, with one exception: Fly's RSS feed does not contain any headlines reporting the three plaintiffs' Recommendations. While the RSS feed is available free of charge and does not earn any revenue for Fly, it is Etergino's hope that readers of the RSS feed will decide to subscribe to Fly's website in order to ben-efit from somewhat quicker and less cumbersome access to the newsfeed.

Fly's staff has grown from five employees in 2002 to a current staff of 28 full— and part-time employees. Approximately half of its staff is involved in production of the live newsfeed, while a smaller number work on the other arms of the business. At one time, six Fly employees worked on the "Recommendations" category, but only two or three employees are now involved.

### B. The Evolution in Fly's Practices

While Fly continues to publish many of the Firms' Recommendations, its sources for those Recommendations have changed because of this litigation. Up until 2005, Fly relied almost exclusively on employees at the Firms who emailed the research reports to Fly soon after they were released. The employees were not authorized by the Firms to provide reports to Fly, but did so nonetheless. Fly staff would peruse the reports for Recommendations, select those it wished to publish, and then type each Recommendation as a headline into its own newsfeed, sometimes accompanied by an extended passage lifted essentially verbatim from the report explaining the basis for the Recommendation.[22]

---

**20.** The content that Fly licensed to Cyber Trader was its "Recommendations" feed, which at trial Etergino stated also included "Hot Stocks" and "General News."

**21.** RSS is a service that automatically syndicates content from a publisher's website in real time, and in a format that enables users to aggregate feeds from many different websites into an RSS reader, where the feeds can all be reviewed in one place.

**22.** The following example is an excerpt from Lehman Brothers' March 1, 2005 machinery industry update report:

A number of potential positive events in March should allow recent rally in machin-ery·sector to continue. Namely, moving forward on an agreement for a highway bill (expected to be approved by May '05) which could come in near $284 billion (up from $218 billion on last bill) and possibly move to the president ahead of schedule. Additionally, ConExpo (construction industry conference) will take place from March 15th to the 19th and should provide a lot of comfort that commercial construction spending is poised to recover over the next few quarters.

. . . .

We continue to recommend purchase of IR, CAT, PH, ETN, ITW and JOYG.

Fly rendered its own "abstract" of Lehman's report on March 1, 2005 as follows:

As a result of this litigation, Fly represents that it has substantially changed its process for gathering and communicating Recommendations. Some investment firms, such as Wells Fargo, continue to send their research reports to Fly directly so that the Recommendations therein can be reported in Fly's newsfeed. When it comes to the plaintiff Firms, however, Etergino professes that he no longer feels free to look at the research reports, even if someone should send them to him. Instead, Etergino asserted at trial that he is usually the only employee who posts the Firms' Recommendations, and by 2009, he was engaging in a ritualistic and labor-intensive process of "confirming" each Firm's Recommendations from at least two and sometimes three independent sources before publishing them, still typically before the market opening.

According to Etergino, he checks first to see what Recommendations have been reported on Bloomberg Market News.[23] Then he checks Dow Jones, Thomson Reuters, and Fly's competitors such as TTN, StreetAccount.com, and Briefing.com. Next, he visits chat rooms to which he has been invited to participate by the moderator.[24] The chat rooms may have a few hundred participants; depending on the software program, the chat room occupants may not know the identities of the others present in the room. Etergino also receives "blast IMs" through the Bloomberg, Thomson Reuters, or IMTrader messaging services that may go to dozens or hundreds of individuals. Finally, Etergino exchanges IMs, emails, and more rarely telephone calls with individual traders at hedge funds, money managers, and other contacts on Wall Street. He has no explicit agreement with any of these sources of information that he will keep their identity confidential, but contends that there is an implied understanding among marketplace participants not to divulge sources' names. This understanding appears to be based on little more than the mutual self-interest in having an edge over the competition with respect to learning about time-sensitive market information.

Fly believes that if it can show that the Firms' Recommendations are already "public"—meaning, apparently, available from non-Firm sources—then it is free to republish them. The documentation proffered by Fly to show its actual source of any particular Recommendation is limited, however, to contemporaneous printouts of Bloomberg Market News feeds and printouts of various word processing documents containing copied-and-pasted text from IMs, chat rooms, subscription newsfeeds, and other internet sources.

As of today, there is a crowded marketplace with small internet companies and major news organizations reporting the

---

Potential positive events moving forward on an agreement for a highway bill (expected to be approved by May '05) which could come in near $284 billion (up from $218 billion on last bill) and possibly move to the president ahead of schedule. Additionally, ConExpo (construction industry conference) will take place from March 15th to the 19th and should provide a lot of comfort that commercial construction spending is poised to recover over the next few quarters. We continue to recommend purchase of IR, CAT, PH, ETN, ITW and JOYG.

**23.** While Fly may have been one of the pioneers of the practice of systematically reporting research analysts' Recommendations, it now faces stiff competition in that field, including from major news companies such as Bloomberg, Dow Jones, and Thomson Reuters. Indeed, Bloomberg recently hired away Fly's chief operating officer in order to better compete in posting "hot news" and analysts' Recommendations.

**24.** Etergino has only met one of the chat room moderators in person.

Firms' Recommendations before and after the market opens. The other financial news organizations that provide services similar to that of Fly, and whom Fly regards as its competitors, include Briefing.com, StreetAccount.com, TTN, StreetInsider.com, TheStreet.com, Midnight Trader, and Jagnotes.com.

### III. The Firms Warn and Then Sue Fly

In about 2004, each of the Firms became aware of Fly and concluded that its control over the distribution of its research had been compromised. On March 3, 2005, Merrill Lynch wrote to Fly demanding that it stop its unauthorized "dissemination of information created by ... Merrill Lynch, including the distribution of products and services referencing Merrill Lynch's investment ratings, advice, or views via theflyonthewall.com." After receiving no response, the Firm sent a second demand letter on April 21, 2005.

On April 13, 2005, counsel for several other investment firms, including Lehman Brothers and Morgan Stanley, sent Fly a cease-and-desist letter accusing Fly of copyright infringement and hot-news misappropriation relating to Fly's publication of those firms' Recommendations in February and March 2005. The letter accused Fly of "free-riding on the Firms' efforts to formulate and disseminate timely market information to their clients," which it characterized as "misappropriation of time-sensitive information" and "the essence of unfair competition."

Counsel for Fly responded to those two letters through its own letters of April 22 and May 5, 2005. The responsive letters represented that Fly "has undertaken a review of its reporting practices" and has "adopted a new format for reporting market information on its website ... [i]n order to avoid any question concerning conflict with your clients' copyrighted research materials." The letter assured the Firms that Fly would "take all necessary steps to avoid any infringement of the [Research] Reports."

As of June 2006, Fly was still posting headlines of the Firms' Recommendations more than an hour before the opening of the market, often before any other media outlet did so, lifting them from research reports sent to Fly from sources inside the Firms.[25] The Firms sued Fly on June 26, 2006, for copyright infringement and misappropriation. They did so based on their conclusion that Fly's misappropriation of their Recommendations was the most systematic and egregious of any of the unauthorized redistributors active in the market at that time.

Pursuant to a confidentiality agreement, Fly eventually provided documentation to the Firms showing that its sources for its headlines about their Recommendations often came from inside the Firms. The Firms promptly shut down this channel of communication between their analysts and brokers and Fly.

### IV. Fly's Lawsuit Against TTN

In October 2007—while settlement talks in this action were ongoing—Fly sued one of its competitors, TTN, alleging the same claims of copyright infringement and hot-

---

**25.** At trial, Etergino denied that Fly was still using research reports sent to him by sources within the Firms to create those headlines, but his counsel's letter of February 1, 2007 identifies contacts within Lehman Brothers and Morgan Stanley as the sources of the June 2006 information. Ultimately, as the trial revealed, few if any of the material facts are in dispute. It should be observed, however, that Etergino was not a reliable reporter of facts. He frequently contradicted himself. His unreliability appeared attributable to both his lack of attention and care in making statements, which tended to be rushed, and his motive to escape liability.

news misappropriation that the Firms had lodged against Fly.[26] The dispute between the two internet news organizations began in 2004, when Fly's counsel advised TTN that it was misappropriating Fly's valuable, time-sensitive, proprietary information by broadcasting content from Fly's newsfeed on its own website within seconds of the content being posted.

In Fly's complaint against TTN, Fly cited 14 instances of alleged copyright infringement and 22 instances of alleged misappropriation between May and October 2007. In several of these news items, Fly had made an error in its posted headline that was then repeated by TTN within minutes. The lawsuit was settled on April 28, 2008 with a monetary payment by TTN to Fly and an order enjoining TTN from knowingly or indirectly gaining access to "non-public news information" reported on Fly's newsfeed.

### CONCLUSIONS OF LAW

The Firms have brought two claims against Fly. As for the first claim, Fly does not dispute that it engaged in copyright infringement and that an injunction may issue, but contests the imposition of attorney's fees and prejudgment interest. As for the second, Fly contests that it is liable for hot-news misappropriation.

#### I. Copyright Infringement

##### A. Liability

■■■■ The first cause of action, brought by Morgan Stanley and Barclays Capital (the "Copyright Plaintiffs"), is for copyright infringement. "[T]o prevail on a claim of copyright infringement, a plaintiff must show both ownership of a valid copyright and copying." *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir.2007) (citation omitted).

In order to prevail on an infringement claim premised on unlawful copying, "the plaintiff must first show that his work was actually copied," and "second, he must establish substantial similarity or that the copying amounts to an improper or unlawful appropriation." *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir.2003) (citation omitted).

The Copyright Plaintiffs have provided seventeen examples between February 14 and March 2, 2005, of Fly's direct, verbatim copying of key excerpts from their research reports and republication of those excerpts on Fly's newsfeed. Eight of these reports were published by Morgan Stanley and nine by Lehman Brothers. For each of the seventeen reports, the Copyright Plaintiffs have proffered registration certificates.

In its defense, Fly asserted that its copying was a fair use of the Copyright Plaintiffs' reports under 17 U.S.C. § 107, and Fly maintained this defense through summary judgment. Fly no longer disputes, however, that it infringed the copyrights in these seventeen reports. As such, judgment shall be entered for the Copyright Plaintiffs on their claims of copyright infringement.

##### B. Remedies

The Copyright Plaintiffs seek a permanent injunction, minimum statutory damages, prejudgment interest, and attorney's fees. Fly does not dispute plaintiffs' entitlement to a permanent injunction, although plaintiffs and Fly could not reach agreement on the terms of that injunction. Fly likewise does not dispute plaintiffs'

---

**26.** Fly's complaint in its suit against TTN also heavily borrowed language, structure, and argument from the complaint in this action.

entitlement to minimum statutory damages of $750 per infringed report.

### 1. Statutory Damages

■ Under the Copyright Act, 17 U.S.C. § 504(a), a plaintiff may elect to pursue either "the copyright owner's actual damages and any additional profits of the infringer" under § 504(b) or "statutory damages" as calculated by § 504(c). As a general principle, "the total number of awards of statutory damages that a plaintiff may recover in any given action depends on the number of works that are infringed and the number of individually liable infringers." *WB Music Corp. v. RTV Commc'n Group, Inc.*, 445 F.3d 538, 540 (2d Cir.2006) (citation omitted).

Plaintiffs have elected to pursue statutory damages and have voluntarily limited their claim to the statutory minimum damages as set out in 17 U.S.C. § 504(c)(1).[27] Because Fly does not contest its liability for minimum statutory damages, Barclays Capital is entitled to $6,750 for its nine infringed reports and Morgan Stanley is entitled to $6,000 for its eight infringed reports.

### 2. Prejudgment Interest

■ The Copyright Plaintiffs seek prejudgment interest on their statutory damage awards. "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995). "By compensating for the loss of use of money due as damages from the time the claim accrues until judgment is entered, an award of prejudgment interest helps achieve the goal of restoring a party to the condition it enjoyed before the injury occurred." *Id.* at 196, 115 S.Ct. 2091 (citation omitted).

■ Unlike the Patent Act, which contemplates an award of interest for victorious plaintiffs in patent infringement actions, *see* 35 U.S.C. § 284(a), the Copyright Act neither authorizes nor forbids prejudgment interest on an award of statutory damages. The Second Circuit has not yet spoken on this issue. *See In Design v. K–Mart Apparel Corp.*, 13 F.3d 559, 569 (2d Cir.1994) ("Whether an award of prejudgment interest is or is not permissible under the current Copyright Act, which neither expressly allows nor prohibits such award, remains unresolved in this Circuit."). Nevertheless, several other Courts of Appeals, as well as many courts of this District, have concluded that prejudgment interest may be awarded under the Copyright Act for both actual and statutory damage awards in the court's discretion. *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 718 (9th Cir.2004); *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 572–73 (7th Cir.2003); *Kleier Adver., Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1040–41 (10th Cir.1990); *TVT Records v. Island Def Jam Music Group*, 279 F.Supp.2d 366, 409–12 (S.D.N.Y.2003), *rev'd on other grounds*, 412 F.3d 82 (2d Cir.2005); *Broadcast Music, Inc. v. R Bar of Manhattan, Inc.*, 919 F.Supp. 656, 661 (S.D.N.Y.1996); *Bourne Co. v. Walt Disney Co.*, No. 91 Civ 344(LLS), 1994 WL 263482, at *3 (S.D.N.Y. June

---

**27.** 17 U.S.C. § 504(c)(1) provides, in pertinent part:

[T]he copyright owner may elect, at any time before final judgment is rendered, to recover … an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually … in a sum of not less than $750 or more than $30,000 as the court considers just.

10, 1994), *aff'd*, 68 F.3d 621 (2d Cir. 1995). In the exercise of its discretion, the Court awards prejudgment interest from the date of publication to entry of judgment. *See Broadcast Music, Inc.*, 919 F.Supp. at 662 n. 2 (awarding interest from the date the copyright infringement occurred); *Bourne Co.*, 1994 WL 263482, at *3 (same).

### 3. Attorney's Fees

Under the Copyright Act, "the court in its discretion may allow the recovery of full costs by or against any party ... [and] may also award a reasonable attorney's fee." 17 U.S.C. § 505. "Attorneys' fees are available to prevailing parties under § 505 of the Copyright Act but are not automatic." *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 117 (2d Cir.2002). "While 'there is no precise rule or formula for making these determinations, equitable discretion should be exercised.'" *Id.* (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994)). The court's considerations should include " 'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Crescent Publ'g Group, Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 147 (2d Cir.2001) (quoting *Fogerty*, 510 U.S. at 534 n. 19, 114 S.Ct. 1023). "Such factors may be used so long as they are faithful to the purposes of the Copyright Act." *Id.* (citation omitted).

■ The legal and factual components of defendant's conduct during the litigation of this case, as well as considerations of general deterrence, counsel strongly in favor of an award of attorney's fees. Although Fly stopped the wholesale copying of the plaintiffs' research reports after it received the cease-and-desist letters in 2005, and ultimately conceded liability for the copyright violations at trial, Fly continued to dispute this liability for over three years following the filing of this action, including through summary judgment.[28] Fly's asserted affirmative defenses included fair use, a defense that was rejected decades ago in *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir.1977) ("*Wainwright*"), a case wherein the defendant had infringed plaintiffs' copyrights in equity research reports broadly similar to those produced by the Firms. In *Wainwright*, as in this case, the defendant "appropriated almost verbatim the most creative and original aspects of the reports, the financial analyses and predictions, which represent a substantial investment of time, money and labor." *Id.* at 96; *see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 71–72 (2d Cir.1999) ("*Nikkei*"). Fly's filing of a copyright infringement lawsuit against TTN in 2007—for copying that was far less extensive than that done by Fly— belies any assertion of good faith by Fly. Although Fly ceased its practice of verbatim copying in 2005, Fly's litigation position was nevertheless objectively unreasonable under *Fogerty*.

---

**28.** Fly suggests that there must have been some merit to its arguments opposing summary judgment on the copyright claim since the Court denied the Firms' motion for summary judgment. Since it was evident that disputed issues of fact prevented an award of summary judgment on the Copyright Plaintiffs' request for attorney's fees as well as on the misappropriation claim, the Court did not issue any detailed examination of the competing summary judgment motions, but simply denied them and set the matter down for trial. Pretrial Scheduling Order, Dkt. No. 87 (Nov. 6, 2009). It would be a mistake to read the November 6, 2009 Order as a judgment about the reasonableness of Fly's proffered defenses to the copyright claim.

In opposing an award of attorney's fees, Fly principally relies upon the disparity in resources between the Copyright Plaintiffs and Fly. In recognition of this economic disparity, the Copyright Plaintiffs are awarded attorney's fees with respect to that portion of the litigation expenses that directly and predominately concerned the Copyright Plaintiffs' prosecution of their copyright infringement claim. A separate scheduling order addressed to that fee application accompanies this Opinion. Once the amount of fees that meets this test is determined, the Court will consider whether a further reduction is warranted based on Fly's financial condition.

### 4. Permanent Injunction

Finally, the Copyright Plaintiffs seek a permanent injunction. The Court adopts, with minor revisions, the injunction proposed by the Copyright Plaintiffs, which restrains Fly from further infringement of "any portion of the copyrighted elements of any research reports" generated by Barclays Capital or Morgan Stanley.[29]

### II. Hot–News Misappropriation

The Firms have also sued Fly for misappropriation of the time-sensitive Recommendations contained in their equity research reports. The parties agree that this cause of action is properly defined as one for "hot-news misappropriation." Before addressing this claim, some background to this doctrine of misappropriation is warranted.

### A. Legal Context

The modern cause of action for misappropriation has its origin in *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) ("*INS*"), a case decided by the Supreme Court under federal common law that found that hot news is protectible as "quasi-property." The Associated Press ("AP") engaged in reporting in Europe during World War I at great expense and distributed the news to its member newspapers on the East Coast of the United States for dissemination to the public. *Associated Press v. Int'l News Serv.*, 240 F. 983, 986–87 (S.D.N.Y.1917). The defendant, International News Service ("INS"), obtained the news from the AP by, among other means, copying AP's stories from bulletin boards and early editions of newspapers printed by AP's eastern affiliates. INS then transmitted those stories to the West Coast, where it sold the paraphrased news stories as its own. The district court declined to enjoin this means of copying stories, but the Court of Appeals reversed and granted AP a permanent injunction. Affirming the Court of Appeals, the Supreme Court located the tort of misappropriation within unfair competition law. Justice Pitney wrote for the Court:

> The fault in the reasoning [of defendant] lies in applying as a test the right of the complainant as against the public, instead of considering the rights of complainant and defendant, competitors in business, as between themselves. The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of it, may be admitted; but to transmit that news for commercial use, in competition with complainant—which is what defendant has done and seeks to justify—is a very different matter. In doing this defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and

---

**29.** Fly has largely agreed to the terms of the Copyright Plaintiffs' proposed injunction.

which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business.

*INS*, 248 U.S. at 239–40, 39 S.Ct. 68.

A fair reading of this passage suggests that the Court's decision was strongly influenced by several policy ideals: a "sweat-of-the-brow" or "labor" theory of property; norms of commercial morality and fair dealing; and a utilitarian desire to preserve incentives to produce socially useful services. Thus, in *INS*, the misappropriation doctrine was developed to protect costly efforts to gather commercially valuable, time-sensitive information that would otherwise be unprotected by law. Justice Brandeis, voicing his displeasure with the result reached by the majority, noted in dissent that "[t]he general rule of law is, that the noblest of human productions—knowledge, truths ascertained, concep-

tions, and ideas—become, after voluntary communication to others, free as the air to common use." *Id.* at 250, 39 S.Ct. 68 (Brandeis, J., dissenting).[30]

After *INS*, the Second Circuit reacted with hostility to the newly created tort. Judge Learned Hand wrote in *Cheney Bros. v. Doris Silk Corp.*, 35 F.2d 279 (2d Cir.1929), that *INS* was not "meant to lay down a general doctrine" and that the case instead applied to "no more . . . than situations substantially similar to those then at bar." *Id.* at 280; *see also R.C.A. Mfg. Co. v. Whiteman*, 114 F.2d 86, 90 (2d Cir.1940) (*INS* does not prevent competitors from "ever appropriating the results of [others'] industry, skill, and expense"); *G. Ricordi & Co. v. Haendler*, 194 F.2d 914, 916 (2d Cir.1952) (*INS* to be "strictly confined" to its facts).

The force of *INS* as formal precedent was vitiated when most federal common law was abrogated by *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Nevertheless, *INS* was adopted into state common law by several states, including most enthusiastically in New York. *See, e.g., Metro. Opera Ass'n, Inc. v. Wagner–Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483, 491 (Sup. Ct.1950), *aff'd*, 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951); *Bond Buyer v. Dealers Digest Publ'g Co.*, 25 A.D.2d 158, 267 N.Y.S.2d 944, 945 (1st Dep't 1966) ("It is now no longer subject to question that there is a property in the gathering of news which may not be pirated."). Eventually, the Second Circuit itself reversed course, ruling (over Judge Learned Hand's dissent) that the misappropriation tort was

---

**30.** To be sure, Brandeis regarded INS's conduct as "inconsistent with a finer sense of propriety," *INS*, 248 U.S. at 257, 39 S.Ct. 68, and even acknowledged that "the propriety of some remedy appears to be clear." *Id.* at 267, 39 S.Ct. 68. Nevertheless, Brandeis as-

serted that "[c]ourts are ill-equipped to make the investigations which should precede a determination of the limitations which should be set upon any property right in news," and suggested that the solution should instead come from Congress. *Id.*

not preempted by the 1909 Copyright Act. *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657, 663 (2d Cir.1955). New York courts continue to recognize a broad tort of misappropriation to this day as part of unfair competition law. *See ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476, 478, 850 N.Y.S.2d 366, 880 N.E.2d 852 (2007) ("We have long recognized two theories of common-law unfair competition: palming off and misappropriation.... [A]n unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." (citation omitted)).

The effect of federal preemption doctrines on the law of misappropriation nonetheless long remained unsettled. In 1964, the Supreme Court launched *"Sears–Compco"* preemption by ruling that Illinois state unfair competition law was preempted by federal patent law. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Co. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). A decade later, the Supreme Court reversed course. *See Goldstein v. California*, 412 U.S. 546, 571, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973) (state misappropriation statute, as applied to unauthorized duplication of sound recordings, not preempted by Copyright Act).[31] Then, the 1976 Copyright Act codified the judicial decisions on preemption and added a new provision, § 301, that explicitly preempts all state causes of action that protect any right equivalent to any of the exclusive rights protected by the Copyright Act, including copying and distribution. Nevertheless, some of the legislative history of the Copyright Act suggested that the Act did not intend to preempt all forms of state-law misappropriation, and in particular, did not intend to preempt the misappropriation of time-sensitive "hot news." The House Report stated:

> "Misappropriation" is not necessarily synonymous with copyright infringement, and thus a cause of action labeled as "misappropriation" is not preempted if it is in fact based neither on a right within the general scope of copyright as specified in section 106 nor on a right equivalent thereto. For example, state law should have the flexibility to afford a remedy (under tradition principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts .... constituting "hot" news, whether in the traditional mold of [*INS*] or in the newer form of data updates from scientific, business, or financial data bases.

H. Rep. No. 94–1476 at 132 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5665. This legislative history has been relied upon regularly by courts, and courts of this and other Circuits continue to recognize the validity of the hot-news misappropriation tort. *See, e.g., Fin. Info., Inc. v. Moody's Investors Serv., Inc.*, 808 F.2d 204, 209 (2d Cir.1986) (*"FII"*) ("The 'hot' news doctrine is concerned with the copying and publication of information gathered by another before he has been able to utilize his competitive edge.").[32]

---

31. A detailed description of judicial developments between *INS* and the 1976 Copyright Act is contained in Howard B. Abrams, *Copyright, Misappropriation, and Preemption: Constitutional and Statutory Limits of State Law Protection*, 1983 Sup.Ct. Rev. 509 (1983).

32. One interesting case of this period that did not concern misappropriation, but with facts similar to the instant case, is *Wainwright*, 558 F.2d 91. In holding a publisher liable for infringing a securities broker's copyrighted research reports, the *Wainwright* court found it relevant not only that the defendant had copied abstracts, but that the defendant's

The 1990s represented another period of flux for the hot-news misappropriation theory. The 1991 decision of the Supreme Court in *Feist* recognized that, while compilations of facts may be subject to copyright protection insofar as the arrangement of facts reflects creativity, the facts themselves are not subject to protection against copying or distribution, thereby decisively repudiating the "sweat-of-the-brow" theory of copyrightability. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 359–60, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) ("*Feist*") ("[T]he 1976 revisions to the Copyright Act leave no doubt that originality, not 'sweat of the brow,' is the touchstone of copyright protection in directories and other fact-based works.") Thereafter, a work must "possess[ ] at least some minimal degree of creativity" in order to be protected under copyright. *Id.* at 345, 111 S.Ct. 1282. At the same time, the *Feist* Court suggested in a mysterious footnote that protection for "hot news" under an *INS*-type misappropriation theory might survive, noting that the "Court rendered judgment [in *INS*] ... on noncopyright grounds that are not relevant here." *Id.* at 354 n. *, 111 S.Ct. 1282.

Soon thereafter, the Restatement (Third) of Unfair Competition ("Restatement") took a similar turn. The Restatement, adopted by the American Law Institute in 1993, recommended in its official commentary that the residual tort of misappropriation, established by *INS* and imported into the common law of many states, be formally abrogated. *Id.* § 38 cmt. b. Nevertheless, the Restatement seemed to eschew closing the door entirely on *INS*, acknowledging that—despite its

preference for Justice Brandeis's dissent— "hot news" scenarios like those of *INS* constitute "unusual circumstances" that "present the most compelling case for protection against appropriation." *Id.* § 38 cmt. c.

The question of whether a hot-news misappropriation claim survives federal preemption was finally resolved in *National Basketball Association v. Motorola, Inc.,* 105 F.3d 841 (2d Cir.1997) ("*NBA*"). In *NBA,* "[t]he crux of the dispute concern[ed] the extent to which a state law 'hot-news' misappropriation claim based on [*INS*] survives preemption by the federal Copyright Act" and, if so, whether the plaintiff's claim fit "within the surviving *INS*-type claims." *Id.* at 843. Plaintiff, a national sports league, sued the maker of a handheld pager sold by Motorola and marketed under the name "SportsTrax," which displayed real-time information about professional basketball games while they were in progress. *Id.* at 843–44. The Court of Appeals concluded that "a narrow 'hot-news' exception does survive preemption," given the "extra elements" of time sensitivity, free-riding, and "the threat to the very existence of the product or service provided by the plaintiff." *Id.* at 843, 853; *see also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 305–06 (2d Cir.2004) (articulating the "extra elements" test for determining the scope of preemption under § 301 of the Copyright Act). Under *NBA,* the elements of an *INS* claim surviving federal preemption are:

(i) a plaintiff generates or gathers information at a cost; (ii) the information is time-sensitive; (iii) a defendant's use of the information constitutes free riding

mode of competition resembled undesirable "chiseling for personal profit," noting that "the appellants' use of the Wainwright reports was blatantly self-serving, with the obvi-

ous intent, if not the effect, of fulfilling the demand for the original work." *Wainwright,* 558 F.2d at 96–97.

on the plaintiff's efforts; (iv) the defendant is in direct competition with a product or service offered by the plaintiffs; and (v) the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened.

*NBA*, 105 F.3d at 845.

The five-element *NBA* claim has been applied by courts in this Circuit at least twice. *See Silver v. Lavandeira*, No. 08 Civ. 6522(JSR)(DCF), 2009 WL 513031, at *6 (S.D.N.Y. Feb. 26, 2009) (plaintiff failed to adequately plead an *NBA* hot-news claim for misappropriation of facts taken from plaintiff's website); *Associated Press v. All Headline News Corp.*, 608 F.Supp.2d 454, 458–61 (S.D.N.Y.2009) (plaintiff properly stated claim under *NBA* for misappropriation of its internet news stories). The *NBA* test has also been embraced by courts outside this Circuit. *See, e.g., ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 960 (7th Cir. 2006) (citing *NBA's* hot-news formulation with approval and concluding that an "*INS*-type claim probably is not preempted"); *Scranton Times, L.P. v. Wilkes-Barre Publ'g Co.*, No. 08 Civ. 2135, 2009 WL 585502, at *3–*4 (M.D.Pa. Mar. 6, 2009) (defendant's alleged copying of facts from plaintiff's obituaries does not constitute hot-news misappropriation under *NBA* ); *X17, Inc. v. Lavandeira*, 563 F.Supp.2d 1102, 1104–06 (C.D.Cal.2007) (archivist properly stated claim for misappropriation of its paparazzi photographs under the "persuasive" formulation of *NBA* ); *Pollstar v. Gigmania Ltd.*, No. Civ. F–00–5671 (REC), 2000 WL 34016436,

at *5–*6 (E.D.Cal.2000) (plaintiff properly stated claim for misappropriation of its time-sensitive concert information); *Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc.*, 73 F.Supp.2d 1044, 1049–50 (E.D.Mo.1999) ("*Moviefone* ") (no genuine factual dispute that defendant's publication of plaintiff's theaters' movie listings did not constitute hot-news misappropriation under *NBA* ). *But see Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F.Supp.2d 737, 756 (D.Md.2003) (suggesting that hot-news misappropriation claim as articulated by *NBA* may be preempted by Copyright Act).[33]

### B. Application of the *NBA v. Motorola* Elements

The parties do not dispute that the elements of the hot-news misappropriation tort under New York law are those set out in *NBA*, 105 F.3d 841. The burden is on the Firms to establish each of the elements of the tort, and each element is considered in turn below.

#### 1. Cost of Generating Information

The first element is that a plaintiff "generates or collects information at some cost or expense." *Id.* at 852. The Firms collectively employ hundreds of skilled analysts and expend hundreds of millions of dollars each year to produce their equity research reports. Fly does not dispute that the Firms have incurred substantial expense in generating their research reports and Recommendations.

#### 2. Timeliness of Information

Second, a plaintiff must show that "the value of the information" generated or col-

---

**33.** Several legislative proposals previously introduced in Congress would have federalized a hot-news misappropriation tort based on *NBA's* five-element claim. *See* Database and Collections of Information Misappropriation Act, H.R. 3261 (108th Cong.) (borrowing all *NBA* criteria except the fourth); Consumer Access to Information Act of 2004, H.R. 3872 (108th Cong.) (borrowing all five criteria).

lected by the plaintiff "is highly time-sensitive." *Id.* As explained by the Second Circuit prior to *NBA*, the *INS* tort encompasses only those situations where the defendant has published time-sensitive information "before [the plaintiff] has been able to utilize his competitive edge." *FII*, 808 F.2d at 209.

The Firms' Recommendations are clearly time-sensitive; the "peculiar value [of research] is in the spreading of it while it is fresh." *INS*, 248 U.S. at 235, 39 S.Ct. 68. The Firms' clients use the analysts' opinions expressed in the Recommendations to execute trades in anticipation of stock price movement in order to capture the maximum benefit from that movement. The dissemination of this information to clients is also a highly time-sensitive endeavor. To reap the greatest benefit from their research reports through the generation of commission income, the Firms must engage in a costly, frenzied process to try to be the first to inform their clients of the Recommendations.

Fly does not dispute that the Firms' Recommendations are time-sensitive. To the contrary, Fly itself highlights the time sensitivity of the information that it publishes in marketing its newsfeed to potential subscribers and business partners. Likewise, in its lawsuit against TTN, Fly asserted that "the value of TheFly's newsfeed is highly time-sensitive," and that this timeliness is one of the key elements of value in the service it provides to its subscribers.

### 3. Free–Riding

■ The third element of the *NBA* hot-news misappropriation tort is that "the defendant's use of the information constitutes free-riding on the plaintiff's costly efforts to generate or collect it," 105 F.3d at 852, thereby enabling the defendant "to produce a directly competitive product for

less money because it has lower costs." *Id.* at 854. In *INS*, the Supreme Court described such conduct as a competitor "endeavoring to reap where it has not sown ... [by] appropriating to itself the harvest of those who have sown." *INS*, 248 U.S. at 239–40, 39 S.Ct. 68; *see also Chi. Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 675 (7th Cir.1992) ("Free-riding is the diversion of value from a business rival's efforts without payment."). In essence, free-riding exists where a defendant invests little in order to profit from information generated or collected by the plaintiff at great cost.

■ Fly's core business is its free-riding off the sustained, costly efforts by the Firms and other investment institutions to generate equity research that is highly valued by investors. Fly does no equity research of its own, nor does it undertake any original reporting or analysis that could generate the opinions reflected in the headlines published in the "Recommendations" section of its newsfeed. Fly's Recommendation headlines consist entirely of regurgitations of the Firms' Recommendations and those of other investment institutions. Because it makes no investment of its own in equity research, Fly can sell the reprinted Recommendations at a cut-rate price to its subscribers and still make a profit. Its only cost is the cost of locating and lifting the Recommendations and then entering a few keystrokes into its newsfeed software.

Although Fly does attribute each of the Recommendations to its originating firm, if anything, the attributions underscore its pilfering. A Recommendation is valuable not because it is a fact that General Motors stock has a new target price, but because one of the Firms has opined that it has one. Investors appreciate that a Recommendation by one of the Firms reflects their very substantial investment in

expert analysis and thus merits careful consideration. In contrast, there is no evidence that a Recommendation by Fly itself to buy, sell, or hold a particular stock would be given any weight whatsoever by any investor. Thus, it is essential to Fly's misappropriation of the Firms' research capital that it connect each Recommendation to its source.

Fly vigorously disputes that it "free-rides" on the Firms' efforts, but its arguments are not persuasive. First, Fly argues that it itself invests substantial resources to quickly gather, edit, and disseminate financial news from various sources. To the extent that Fly adds value through its collection and aggregation of information, however, the value reflected in that act of aggregation does not controvert the fact that Fly expends no effort to produce the Recommendations and does not contribute to the underlying research and analysis process.

Second, Fly argues that for the last few years it has not been free-riding off the Firms' efforts because it no longer lifts the Recommendations from the Firms' research reports, but instead relies on others' headlines, thereby establishing in Fly's view that the Recommendations have become "public" and free for the taking. It points to the frequent publication of the Recommendations by other news services, both mainstream and internet, in advance of Fly's own publication of headlines and to the widespread discussion of the Recommendations in market chat rooms and "blast IMs," among other sources.

The fact that others also engage in unlawful behavior does not excuse a party's own illegal conduct. Although the practices of other potentially liable parties is highly relevant to the fashioning of equitable relief and will be considered below, the conduct of third parties is simply of no moment in finding Fly liable for hot-news misappropriation. Similarly, even if true, it is not a defense to misappropriation that a Recommendation is already in the public domain by the time Fly reports it. In *INS*, for example, AP's news was already widespread and publicly available on the East Coast and was obtained by the defendant from public sources, and yet, the Court granted an injunction against INS's further dissemination of news gained through those means. *INS*, 248 U.S. at 245–46, 39 S.Ct. 68; *see also Bond Buyer*, 267 N.Y.S.2d at 946 (enjoining defendant's misappropriation of plaintiff's bond-market reports even though they were already in the public domain).[34]

Moreover, Fly's reliance on the widespread discussion of the Firms' Recommendations among participants in the securities marketplace should be placed in the proper context. First, it is undisputed that the Firms have made a very substantial and costly effort to study the unauthorized dissemination of their research reports and, harnessing the resulting in-

---

**34.** Since it does not matter whether Fly has taken its headlines directly from the Firms' research reports or elsewhere, it is not necessary to decide the credibility of Fly's description of its current methodology for researching the Firms' Recommendations, nor to decide which of the putative sources for its headlines could properly be considered "public" in nature. It bears mention on this point, however, that it became clear at trial that Fly's assertion to the Firms during fact discovery that it had explicit confidentiality agreements with its sources is false. It had no such explicit agreements, and it further appears implausible that it had any implicit understanding of confidentiality with any source. Most of its putative sources were published reports by others, chat room conversations with scores of persons who did not know each other, or "blast IMs" to mass groups. At best, Etergino had a working relationship with various individuals to share information with one another because they found the exchange to be mutually beneficial.

sights, to work to plug the leaks they have found. Second, whatever the effect of Fly's conduct, it is unavoidable that the Firms' broad, client-based dissemination model will nonetheless result in news of their Recommendations being spread quickly from one investor to another. Nevertheless, the legally salient fact in this milieu is not that actors in the marketplace repeat news of Recommendations to their friends and colleagues, such that the word inevitably gets out. Rather, it is that Fly is exploiting its self-described "hefty relationships with people in the know" to gather information from the rumor mill and run a profitable business dedicated, in large part, to systematically gathering and selling the Firms' Recommendations to investors. *Cf. INS*, 248 U.S. at 239, 39 S.Ct. 68 ("The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously ... may be admitted; but to transmit that news for commercial use, in competition with complainant ... is a very different matter.") Fly was one of the first to engage in this practice and one of its most ardent, and successful, early practitioners. That reporting Recommendations has become a common practice since Fly developed the business, or that one can readily catch wind of Recommendations by participating in the Wall Street rumor mill, does not excuse Fly's systematic misappropriation.

Fly's argument that its practices are in accordance with prevailing industry norms—that, in essence, no one "owns" financial information once it is released—is further undermined by Fly's use of the hot-news misappropriation theory to sue one of its competitors, TTN. That lawsuit was premised on the notion that Fly has a proprietary, excludable interest in the Recommendations that it reports on its newsfeed. Fly described its newsfeed as containing "proprietary and economically valuable material that is intended to assist its subscriber's [sic] in making investment decisions," and asserted that the "value of the newsfeed to TheFly's subscribers is greatly enhanced by its limited dissemination, i.e., its exclusivity." While Fly is not now estopped from asserting otherwise, such a total reversal in position from one litigation to the next casts serious doubt on the sincerity of its arguments.

Finally, in an argument relevant to both the third and fourth elements of the *NBA* hot-news claim, Fly asserts that it reports "much more" than the Firms' Recommendations. It reports equity recommendations from as many as sixty-five different investment firms, and its newsfeed includes "a broad range of financial news and data" falling within ten categories. This argument fails as well. In *INS*, for example, the defendant was liable notwithstanding the fact that only one narrow aspect of its business constituted misappropriation: the reporting of news about military and political developments in Europe during World War I. Similarly, in *Bond Buyer*, the defendant's publishing activities went far beyond the prohibited conduct, but that fact was immaterial. *Bond Buyer*, 267 N.Y.S.2d at 945–46. Nor can Fly escape liability by pointing to its selectivity or to the existence of Recommendations that it chooses not to publish. *Cf. Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 564–65, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) ("*Harper & Row*") (denying a "fair use" defense to copyright infringement where the defendant's taking was limited, but verbatim and "essentially the heart of the book"); *Nikkei*, 166 F.3d at 72 (a copyright infringer cannot "excuse the wrong by showing how much of [the plaintiff's] work he did not pirate" (citation omitted)); *Wainwright*, 558 F.2d at 96 (finding liability where the defendant's taking was limited,

but included "the most creative and original aspects of the reports, [which were] the financial analyses and predictions").

#### 4. Direct Competition

The fourth element is that "the defendant's use of the information is in direct competition with a product or service offered by the plaintiff." *NBA*, 105 F.3d at 852. The *INS* court held that a defendant may pursue "any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of [its news]," *INS*, 248 U.S. at 239, 39 S.Ct. 68, but that he may not engage in "an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point whether the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not." *Id.* at 240, 39 S.Ct. 68. To be sure, misappropriation requires that the competition be sufficiently direct. In *NBA*, the plaintiff—whose "primary business" was producing live basketball games and licensing copyrighted broadcasts of those games—was not in direct competition with the defendant, which sold and marketed a pager featuring real-time sports data. The collection and retransmission of strictly factual material about the games was, at best, collateral to the plaintiff's business. *NBA*, 105 F.3d at 853; *see also id.* at 853 n. 8 ("While courts have recognized that one has a right to one's own harvest, this proposition has not been construed to preclude others from profiting from demands for collateral services generated by the success of one's business venture." (citation omitted)); *U.S. Golf Ass'n v. St. Andrews Sys., Data–Max, Inc.*, 749 F.2d 1028, 1029–30 (3d Cir.1984) (defendant's use of golf handicapping formula did not constitute misappropriation under *INS* because the defendant did not "compete directly" with plaintiff or "interfere with [its] economic incentives").

■ The Firms have shown that they and Fly are in direct competition in disseminating Recommendations to investors for their use in making investment decisions. The production and dissemination of equity research reports, and the Recommendations from those reports, is one of the "primary" businesses for each of the Firms. Production of research is central to the Firms' services to their clients and to their competition with other investment banks and brokerage services. The Recommendations, in turn, reflect the heart of that research, and are its most valuable element; for many of the Firms' clients, news of the Recommendations alone is enough to entice the clients into making a trade.

Likewise, the dissemination of the Recommendations is the "primary business" of Fly. It has built its most valuable section of its newsfeed around the delivery of that core product and aptly names that section: "Recommendations." It touts its ability to be the "fly on the wall" inside the Firms, listening to the opinions of the analysts as they are delivered, and advertising its newsfeed as "a valuable resource for any investment decision." Moreover, Etergino admitted that these Recommendations, which he characterized at trial as "snippets," are intended to assist Fly's subscribers in making investment decisions. Thus, Fly's extensive and systematic use of the Firms' Recommendations is undertaken "with the obvious intent, if not the effect, of fulfilling the demand for the original work." *Wainwright*, 558 F.2d at 96 (citation omitted). To the extent that Fly succeeds in fulfilling that demand, it is directly to the plaintiffs' detriment, not a mere collateral windfall.

Both the Firms and Fly even use similar, and in some instances identical, chan-

nels of distribution. The Firms deliver their research reports directly to their client investors through access-controlled media, and Fly runs a subscription website. The Firms and Fly also license third-party distributors, including several of the same media giants, to provide their content to entitled recipients.

Finally, Fly has taken steps to compete even more directly with the Firms by aligning itself with discount brokerage services such as Cyber Trader, eSignal, and NewsWare. Fly's efforts, which have met with some success, to link its subscribers to discount brokerage services reflect the final stage in its direct competition with the Firms by leveraging its access to their Recommendations and driving away their commission revenue. Whether Fly succeeds in directly linking every one of its subscribers to a discount broker, however, is beside the point. The Firms have shown that the ability of their clients to obtain their Recommendations elsewhere has had, and will continue to have, a direct impact on their generation of commission revenue. As Browning testified, her Firm "loses potential clients who otherwise might do business with the Firm if they can get timely and regular access to our research recommendations" elsewhere.

Despite this extensive and essentially undisputed evidence of direct competition, and despite having previously asserted counterclaims against the Firms for their unfair competition with Fly, Fly argues that it does not compete with the Firms. Fly maintains that *NBA* should be interpreted to require proof of "head-to-head competition in a primary market," and argues that the Firms and Fly do not fit that proffered standard. While the Firms offer

brokerage services, Fly is a news service retransmitting "strictly factual material about the financial markets" and does not provide brokerage, investment advice, or other financial services.[35] While it may be true that Fly is a news aggregator and is in direct competition with other financial news aggregators, both large and small, each of these news aggregators is in direct competition with the Firms when they report the Firms' Recommendations in a timely and systematic manner such that the Firms are deprived of the opportunity to communicate them first-hand to their clients. Moreover, to the extent that Fly argues that it does not compete with the Firms because it reports "news" about the Recommendations rather than the Recommendations itself—a theoretical distinction not borne out in reality—such an argument apparently overlooks the fact that "news" is, in fact, the archetypal subject matter of a hot-news misappropriation claim.

Second, Fly notes that it reports only Recommendations and no longer lifts or summarizes passages from the Firms' underlying research reports. Etergino offers that, in his opinion, the Recommendations are but one factor on which investors rely in making investment decisions, and that investors value the research report itself highly. This argument is quickly addressed. The premise underlying Fly's entire business is that immediate access to the Recommendations alone is extremely valuable. It is lucrative, of course, because the market understands that the Recommendations emanate from respected sources that have invested substantial resources in formulating the Recommendations and that detailed research reports

---

**35.** Etergino explains that "[t]he Firms and their market recommendations are the news—each of the Firms has a reputation in the financial industry, such that their actions and recommendations have the potential to influence the market's valuation of equity securities, and are widely reported as news in the financial press."

are available to explain the underlying analyses. As trading volume and market movements demonstrate, many clients who generate significant commission income for the Firms are volume traders who quickly trade on the Recommendations with little or no opportunity to scrutinize and evaluate the actual research reports at their leisure. It was not contested at trial that many large-scale investors trade on the Recommendations alone and that those Recommendations capture the critical content of the research report.

Third, Fly has occasionally made the argument that it merely reports what has "already happened" in the marketplace. The basis for this argument appears to be Fly's untested hypothesis that the Firms' Recommendations are absorbed (or "discounted") into the price of the stock immediately, such that—by the time Fly posts them on its newsfeed—the market has already adjusted to the information even though the market may not open for trading for hours. If such a statement were true, however, Fly would gain relatively little value from collecting and publicizing the information. Moreover, Fly's own promotional material makes clear that the value that Fly intends to offer to its subscribers is to inform their investment decisions and to allow them to cash in on the Firms' equity research through making timely trades.

### 5. Reduced Economic Incentives

■ The final element of the hot-news misappropriation tort is that "the ability of other parties to free-ride on the efforts of the plaintiff would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened." *NBA*, 105 F.3d at 852. So phrased, the element requires the plaintiffs to demonstrate not that their business has already sustained serious damage at the hands of the defendant, but rather, that the conduct of Fly and other similar parties, if permitted to continue, would be likely substantially to threaten plaintiffs' ability to continue to participate in the market. As with the other four, this fifth element finds inspiration in *INS*, which observed that "by permitting indiscriminate publication by anybody and everybody for purposes of profit in competition with the news-gatherer, it would render publication profitless, or so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison with the return." *INS*, 248 U.S. at 241, 39 S.Ct. 68. The *INS* holding cannot be understood without understanding the court's desire to "afford compensation for the cost of gathering and distributing [the news], with the added profit so necessary as an incentive to effective action in the commercial world." *Id.* at 235, 39 S.Ct. 68. This final element also helps to align the tort with the overriding public interest, so that it serves to protect socially valuable products or services in danger of being underproduced.

■ The Firms have supplied ample evidence that the continued conduct of Fly, and others like Fly, would so reduce their incentive to invest the resources necessary to produce equity research reports that the continued viability of plaintiffs' research business is and "would be substantially threatened." Indeed, the conduct of Fly and others has, along with other unrelated factors, already reduced the resources devoted to the research aspect of the Firms' business. The ability of the Firms to "monetize" their research is critical to its continued production. Thus, the factual scenario at the heart of the hot-news misappropriation doctrine exists here.

If services like AP were not assured of property rights in the news they pay to

collect, they would cease to collect it. The ability of their competitors to appropriate their product at only nominal cost and thereby to disseminate a competing product at a lower price would destroy the incentive to collect news in the first place.

*NBA,* 105 F.3d at 853.

Fly's arguments to the contrary are unpersuasive. First, Fly observes that the Firms have failed to provide statistical evidence to show that they have lost customers, trades, or (ultimately) profits because of Fly's conduct, and have relied instead on speculative, self-serving lay opinions. Fly, however, misapprehends the nature of what must be proved to sustain the fifth element and win injunctive relief. The Firms do not need to show that Fly has directly caused them actual, quantifiable damage—rather, they must show that the free-riding, if left unrestrained, *"would* so reduce the incentive to produce the product or service that its existence or quality *would be* substantially threatened." *NBA,* 105 F.3d at 845 (emphasis added). *INS* itself required no direct proof of lost profits in order to sustain a permanent injunction against unfair competition. *INS,* 248 U.S. at 241, 39 S.Ct. 68 (noting the "obvious results" of INS's conduct in terms of its effect on AP's profitability).[36]

Fly's evidentiary challenges are also without merit. The Firms' witnesses who testified about these matters were senior research executives, that is, the very individuals in the best position to understand their Firms' business models and the budget decisions behind the investment being made in research. Moreover, to the extent that they testified regarding their opinion, it was to matters that were "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue," *United States v. Yannotti,* 541 F.3d 112, 125 (2d Cir.2008) (citation omitted), and thereby constitute proper lay opinion testimony under Fed. R.Evid. 701.[37] Moreover, common sense and the circumstantial evidence about the plaintiffs' business model make the Firms' contentions about its reduced incentives utterly credible. Why should any business invest substantial sums in an activity that does not contribute to the bottom line?

Second, Fly asserts that it is not alone in reducing the Firms' incentives to invest in equity research. This argument again misapprehends the nature of the showing that the Firms must make to satisfy the *NBA* test. *NBA* provides that the plaintiffs must show that the ability of "other parties," which may include the defendant as well as others, to free-ride on the efforts of the plaintiffs would substantially reduce incentives to produce the equity research. 105 F.3d at 845; *see INS,* 248 U.S. at 241, 39 S.Ct. 68 (considering the effects of "indiscriminate publication by anybody and everybody" on AP's newsgathering incentives). Again, to the extent that the phenomenon of rapid and systematic unauthorized distribution of the Firms'

---

**36.** Fly also cites as authority certain *dicta* from *Moviefone,* where a federal district court in Missouri interpreted *NBA* to require proof that "defendant's actions must make plaintiff virtually cease to participate in the business in question." *Moviefone,* 73 F.Supp.2d at 1050. This statement, which is not controlling authority in this Circuit, misconstrues the plain meaning of the fifth element of the *NBA* test.

**37.** In response to Fly's motion *in limine,* certain passages were stricken from the proffered direct testimony of the Firms' witnesses. Once those passages had been stricken, Fly had no further objection at trial as to any portion of the direct testimony on the ground that it was inadmissible opinion testimony or on any other ground.

Recommendations extends beyond Fly—and it does—that does not provide Fly with a defense, but it will affect the terms of the injunction.

Third, Fly argues that other factors in the marketplace have threatened production of equity research. These factors include the burst financial bubble and an extended recession; the Global Research Analyst Settlement between federal and state regulators and Wall Street investment firms in April 2003; and the availability of discount electronic trading platforms as a low-cost alternative to the Firms' full-rate trade execution services. These discount brokerage firms are able to offer cheaper trading services in part because they do not generate their own equity research and bear any of the associated costs. There is no need to measure the exact impact that each of these events has had on the Firms and their investment in research. It suffices that the Firms presented persuasive evidence that shows that, these other events aside, the misappropriation of their Recommendations by Fly and others has also had a profound effect on their business model.

## C. Scope of Injunctive Relief

 Fly's liability for hot-news misappropriation having been established, the proper scope of injunctive relief must be determined. In so doing, matters of public policy will help shape the decisions to be made. Courts granting equitable relief, such as a permanent injunction, "may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 424 (2d Cir.2004) (citation omitted). Thus, before explaining the features of the injunction that will issue, the policies that have informed the scope of the injunction will be described.

### 1. Public Policy Considerations

 It was undisputed at this trial, and explicitly conceded by Fly, that the production of equity research in general, and its production by the plaintiff Firms specifically, is a valuable social good. Such research plays a vital role in modern capital markets by helping to disclose information material to the market, to price stocks more fairly and, as a result, to produce a more efficient allocation of capital. Although the gains from immediate trading and rapid stock movement based on knowledge of Recommendations may be realized initially only by sophisticated investors, all market participants benefit from a market operating to align prices with underlying value as quickly as possible. Indeed, three decades of jurisprudence in federal securities law have built upon the understanding that investors may rely in bringing a securities fraud lawsuit on the integrity of the market price of a stock to create a presumption of transaction causation. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The fraud-on-the-market theory reflects a belief that in complex and interconnected financial markets, the market "act[s] as the unpaid agent of the investor" and "transmits information to the investor in the processed form of a market price." *Id.* at 244, 108 S.Ct. 978 (citation omitted). Although the fraud-on-the-market theory is subject to important limitations—for example, it cannot be applied where a market is illiquid or otherwise inefficient, *see Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204–11 (2d Cir.2008)—it is noteworthy that one of the factors frequently considered by courts in deciding whether a particular securities market is "efficient" is the "number of securities analysts following and reporting on" the securities and "mak[ing] buy/sell recommendations to

client investors." *Id.* at 200, 205 (citation omitted); *see also In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514 (1st Cir.2005). Because the availability of the detailed and sophisticated analysis that can appear in research reports, which are the basis for the Recommendations, depends upon their producer's ability to reap a benefit from producing it, research reports' analyses of corporations will be underproduced unless the Firms can achieve an economic return on their investment.

It is also worth bearing in mind that the Recommendations are not objective facts, but rather, subjective judgments based on complex and imperfect evidence. In this sense, the Recommendations produced by the Firms represent the kinds of information to which the Court of Appeals has seen fit to extend protection under copyright laws. Such information has been described as "soft facts" or "soft ideas infused with taste or opinion," and explicitly includes items such as subjective valuations or target prices. *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 67, 72 (2d Cir.1994) (defendant's copying of "virtually the entire compendium" of used car price valuations, created based on authors' creative "predictions" and "professional judgment," constituted copyright infringement); *see also CDN Inc. v. Kapes*, 197 F.3d 1256, 1260 (9th Cir.1999) (estimated wholesale valuations for collectible coins copyrightable because subjective).

The public interest in the production of equity research notwithstanding, there is also a competing, and no less important, public interest in "unrestrained access to information," particularly when the information is heavily fact-based. *FII*, 808 F.2d at 207. Widespread access to information is critical to "the progress of Science and the useful Arts," U.S. Const. art. I, § 8, cl. 8, and it is in part for this reason

that Congress and the courts have declined to extend copyright protection to pure facts. *See Harper & Row*, 471 U.S. at 558, 105 S.Ct. 2218; *CCC*, 44 F.3d at 69. It is clear that widespread access to financial information on reasonable terms is essential to strong financial markets. Giant institutional investors may not prevent others from listening in on important conversations about the value of securities. For this reason, the Firms appropriately conceded at trial that there is, and should be, an "ordinary presumption in favor of the free flow of information." Plaintiffs seek only that the incentives be preserved to create the activity that generates that information in the first place.

Ultimately, the purpose of the *INS* tort, like the traditionally accepted goal of intellectual property law more generally, is to provide an incentive for the production of socially useful information without either under—or over-protecting the efforts to gather such information. A balance must be struck between establishing rewards to stimulate socially useful efforts on the one hand, and permitting maximum access to the fruits of those efforts to facilitate still further innovation and progress on the other. What the Supreme Court said in *Harper & Row* on the subject of copyright protection is no less applicable here: "The challenge of copyright is to strike the difficult balance between the interests of authors ... in the control and exploitation of their writings ... on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand." *Harper & Row*, 471 U.S. at 580, 105 S.Ct. 2218 (citation omitted); *see also CCC*, 44 F.3d at 69 n. 13; *United States Golf Ass'n*, 749 F.2d at 1038–39. Cognizant of the balance that must be struck, the Second Circuit explicitly reaffirmed the existence of a narrow hot-news misappropriation cause of action because, without one, "[t]he newspaper-

reading public would suffer because no one would have an incentive to collect 'hot news.'" *NBA*, 105 F.3d at 853.

The balance of these considerations strongly supports the injunctive relief that will be ordered in this action. This injunction, unlike those issued in *Board of Trade v. Dow Jones & Co., Inc.*, 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (1983), or *Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.*, 683 F.2d 704 (2d Cir.1982), will not grant plaintiffs an effective monopoly over a particular financial concept, formula, or line of business. Anyone, including Fly, remains free to conduct equity research, write research reports, and make Recommendations. Nor will Fly be restrained with respect to any element of its newsfeed that does not involve reporting the Firms' Recommendations or conference call access information. An injunction with a limited period of exclusivity for the dissemination of a Firm's Recommendations will, however, preserve the incentive to create equity research and ultimately spread the benefits of that research to all investors through the operation of the markets.

### 2. Length of Temporal Protection

■ Injunctive relief must be carefully crafted. Fed.R.Civ.P. 65(d) provides that "[e]very order granting an injunction ... must state the reasons why it issued; state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document-the act or acts restrained or required." The Court of Appeals has interpreted this standard to require that it be "ascertain[able] from the four corners of the order precisely what acts are forbidden or required." *Petrello v. White*, 533 F.3d 110, 114 (2d Cir.2008) (citation omitted). In the intellectual property context, an injunction protecting against further disclosure of proprietary information must be "narrowly tailored" to avoid placing "unnecessary burdens on lawful commercial activity," *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir.2009) (citation omitted), or on conduct that was not the subject of this case. *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir.2003). An injunction that does not provide such specificity will fail for being "impermissibly vague." *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 157 (2d Cir.2004) (per curiam).

■ The length of time for which the Firms should be protected from unauthorized redistribution or repetition of their Recommendations is the most important question to be determined. Ordinarily, "[t]he originator of valuable information ... has an opportunity to exploit the advantage of a lead time in the market," thereby "provid[ing] the originator with an opportunity to recover the costs of development and ... encourag[ing] continued investment." Restatement § 38 cmt. c. In *INS*, the Supreme Court described this lead time for exploitation of the news as the period "until its commercial value as news to the complainant and all of its members has passed away." *Id.* at 245 (emphasis omitted).

In this case, the goal is a period of lead time long enough to enable the Firms to conduct a reasonable sales effort and to retain the advantage of being the first to reach key institutional investors who may react promptly to a Firm's Recommendation. Where the investor will require a more sustained consultation with the Firm or wish to ponder the research report in more depth, however, it is unnecessary to restrict unauthorized dissemination of the Recommendations. In those instances, the research reports themselves retain value even though their Recommendations may be widely known. With the right lead

time, the Firms will retain an incentive to create their research, but they will not be given a vise to squeeze every last cent out of their efforts to the exclusion of others.

Plaintiffs seek an injunction against reporting a Recommendation for four hours from the release of a research report or until 12:00 p.m., whichever is later in time.[38] They contend that only this length of time is able to restore "breathing room for a reasonable sales and trading effort." Fly, without conceding liability, argues that the injunction should last no longer than ten minutes from the release of the report to a Firm's customers, which is usually hours before the market opens.

There are three time frames for the length of an injunction that should be considered, at least in connection with the majority of research reports, that is, those released in the early morning hours when the markets are still closed. These time frames, each of which begins upon the release of the Recommendation, last as follows: (1) for some length of time ending before the 9:30 a.m. market opening; (2) for some relatively limited period ending just after the 9:30 a.m. market opening; and (3) for a period of hours after market opening, up to the two-and-one-half hours requested by the Firms.

Upon careful consideration, it is apparent that it is the middle alternative that is superior. This time frame preserves incentives for the Firms to create and disseminate research reports to their investor clients, while still recognizing the inevitable, fast-moving, and widespread informal communication of Recommendations on Wall Street. Because this time frame will not fully insulate the Firms from the pressures of adjusting to the rapidly evolving informational marketplace, it will also mo-

tivate the Firms to continue to explore ways to improve and expedite the dissemination of their research.

The first time frame would be too short. Embargoing the Recommendations so that they cannot be reported by Fly before the market opens, whether that be for ten minutes after the release of research reports or right up to the 9:30 a.m. opening of the market, would be inadequate to preserve the Firms' incentive to invest in producing research for their clients. The Firms engage in hours of effort, beginning at 8:00 a.m., to reach certain key clients and communicate their Recommendations. The Firms must have some significant amount of time to reach those clients and for those clients to be in a position to trade on that information by placing and executing orders through the Firms. Any injunction that does not include a period after the opening of trading will in all likelihood interfere with the incentive of the clients to place their trades through the Firms.

Conversely, the Firms have not shown that an injunction lasting for several hours after the market opening is necessary to preserve their incentive to create high-quality research reports. While they showed that their intensive outreach and sales program lasted at least that long, if not longer, they did not show that the clients who they reached in the mid-to-late morning period were the clients who were likely to trade on Recommendations alone, as opposed to those who wanted an explanation of the research reports and the reasoning behind their Recommendations. Thus, they did not show that the longer injunction against unauthorized systematic dissemination of the Firms' Recommendations was necessary to protect the incentive to create the report itself.[39] The

---

**38.** The Firms had initially requested an injunction of the later of four hours or 1:00 p.m.

**39.** While the Court could have benefited from expert testimony about the trading patterns of

Court declines to provide relief beyond that minimum level of protection necessary to ensure that a socially valuable product is not driven out of the market through unfair competition.

As a result, in the case of research reports released when the market is closed, an injunction will issue forbidding the dissemination of the Firms' Recommendations until one half-hour after the opening of the New York Stock Exchange or 10:00 a.m., whichever is later. As a practical matter, this will give the Firms one-and-a-half hours to reach the clients who are most likely to trade upon the knowledge of the Recommendation alone and to give the Firms an opportunity to have any trading by clients based on those Recommendations placed through the Firms and to have those trades executed.

For Recommendations issued while the market in New York is open for trading, the defendant will be enjoined from publishing the Recommendations until two hours after their release by the Firms. For the same reasons stated above, such a period is sufficient to enable the Firms to notify certain key clients of those Recommendations, to conduct a reasonable sales and trading effort, and to generate an economic return on their research investment.

3. Exception for Non–Systematic, Contextual Reporting After the Market Opens

It is also important to distinguish between the aggregation and repetition of the Firms' Recommendations and limited, justifiable uses of such information. Liability for hot-news misappropriation ex-

tends only to a narrow category of competitive conduct: free-riding activity that is directly competitive with the Firms' production of time-sensitive information, thereby substantially threatening their incentive to continue in the business. Conduct by Fly that falls short of this standard would not violate New York common law and, therefore, should not be enjoined. Drawing this line may be difficult, but it is nonetheless necessary to do. Thus, to the extent Fly alters its business and begins to engage in actual analysis of market movements, and refers on occasion after the market opens in New York to one of the Firms' Recommendations in the context of independent analytical reporting on a significant market movement that has already occurred that same day, such conduct will not run afoul of the injunction.[40]

4. One–Year Reevaluation

Since Fly first built its business around the misappropriation of the Firms' Recommendations, the practice of posting the Firms' Recommendations has become a widespread phenomenon. It would be unjust to restrain Fly from publishing the Firms' Recommendations if the Firms were to acquiesce in the unauthorized publication of their Recommendations by others, be they small internet news services or global news empires. As Fly acknowledged at trial, it will not be disadvantaged relative to its competitors by not being able to publish the Firms' Recommendations if its competitors are restrained as well. Consequently, one year from the issuance of this injunction, Fly may apply to modify or vacate the injunction in the event that it can demonstrate that the

different investors and during different periods of the day, ultimately the parties provided sufficient evidence to permit lines to be drawn regarding the length of the injunction with sufficient confidence.

**40.** In the event that Fly uses this exception to make an end-run around the injunction, the Firms may apply to the Court for an amendment to the injunction.

Firms have not taken reasonable steps to restrain the systematic, unauthorized misappropriation of their Recommendations, for instance, through the initiation of litigation against any parties with whom negotiation proves unsuccessful.[41]

## CONCLUSION

The Clerk of Court shall enter judgment for the plaintiffs on both the copyright claim and the hot-news misappropriation claim. A permanent injunction restraining the defendant from further copyright infringement and misappropriation accompanies this Opinion and Order. Plaintiff Morgan Stanley is awarded $6,000 in statutory damages, and plaintiff Barclays Capital is awarded $6,750 in statutory damages, each with prejudgment interest as set forth above. Plaintiffs are directed to submit an application for attorney's fees as set out in a scheduling Order accompanying this Opinion.

SO ORDERED.

## OPINION & ORDER

This lawsuit, brought by three large financial services firms (collectively, the "Firms") involves claims of copyright infringement and "hot-news" misappropriation against a financial news aggregator, Theflyonthewall.com ("Fly"), arising out of Fly's regular and systematic dissemination on its online newsfeed of the Firms' valuable, time-sensitive equity research recommendations ("Recommendations"). After Fly conceded liability for copyright infringement, a non-jury trial was held to determine liability on the misappropriation claim. Following a four-day bench trial, this Court found for the Firms. *See Bar-*

*clays Capital Inc. v. Theflyonthewall.com,* 700 F.Supp.2d 310, No. 06 Civ. 4908(DLC), 2010 WL 1005160 (S.D.N.Y. Mar. 18, 2010) (the "March 18 Opinion"). A permanent injunction was entered restraining Fly from reporting headlines about the Firms' Recommendations before one half-hour following the market opening or two hours after the Recommendation is released, whichever is later. *See Barclays Capital Inc. v. Theflyonthewall.com, Inc.,* No. 06 Civ. 4908(DLC), Dkt. No. 138 (S.D.N.Y. Mar. 18, 2010) (the "Injunction"). Familiarity with the March 18 Opinion and the Injunction are assumed.

On April 9, 2010, Fly appealed this case to the Court of Appeals for the Second Circuit.[1] On April 13, Fly moved pursuant to Federal Rule of Civil Procedure 62(c) to stay the Injunction, or in the alternative, to modify the Injunction so that Fly is permitted to report on the Firms' Recommendations as soon as a "mainstream" news service has published them. Fly has not moved for an expedited appeal, but represents that it will do so once this motion is resolved. For the following reasons, Fly's motion for a stay or modification of the Injunction is denied.

## DISCUSSION

### I. Fly's Stay Application

■■■■ "A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder,* 556 U.S. ——, 129 S.Ct. 1749, 1760, 173 L.Ed.2d 550 (2009) (citation omitted).

---

**41.** At trial, the Firms agreed that one year would be a reasonable and appropriate interval for such a review.

**1.** Fly appeals from the finding of liability on the hot-news misappropriation claim as well as the award of attorney's fees and prejudgment interest on the copyright infringement claim.

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 1761. The four factors to be considered by a court in deciding whether to issue a stay pending appeal are:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)); *see also In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir.2007) (*"In re WTC"*). Although "[t]he first two factors … are the most critical," *Nken*, 129 S.Ct. at 1761, "the degree to which a factor must be present varies with the strength of the other factors, meaning that more of one factor excuses less of the other." *In re WTC*, 503 F.3d at 170 (citation omitted); *see also Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir.2004). A stay is proper, for example, where the plaintiff can "demonstrate[ ] some possibility of success and the balance of hardships tips decidedly in his favor." *Thapa*, 460 F.3d at 335.

## A. Likelihood of Success on the Merits

The first factor to be considered is "whether the stay applicant has made a strong showing that he is likely to succeed on the merits." *Nken*, 129 S.Ct. at 1761. There is no precise threshold of probability that must be demonstrated in order to satisfy this factor. *See Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir.2002) ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors." (citation omitted)).

Fly's liability for hot-news misappropriation resulted from an application of the five-element formulation of that tort under New York law as articulated in *Nat'l Basketball Ass'n v. Motorola*, 105 F.3d 841 (2d Cir.1997) (*"NBA"*). Those elements are as follows:

(i) a plaintiff generates or gathers information at a cost; (ii) the information is time-sensitive; (iii) a defendant's use of the information constitutes free riding on the plaintiff's efforts; (iv) the defendant is in direct competition with a product or service offered by the plaintiffs; and (v) the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened.

*Id.* at 845. Fly conceded at trial that *NBA* governs the Firms' misappropriation claim, but argued that the Firms could not demonstrate that all five elements were satisfied.

 In its application for a stay, Fly asserts two bases for challenging the finding of liability in the March 18 Opinion.[2] First, Fly asserts that there is a "substantial question" as to "whether a news service such as Defendant's is in 'head-to-head' direct competition with the plaintiffs, which are investment banks." Second, Fly questions "whether plaintiffs have made the necessary evidentiary showing of a substantial threat to their incentive to continue in the business."

**2.** In its reply brief, Fly asserts that "the factor of 'likelihood of success' should therefore be neutral at best in the Court's evaluation of the stay and should not weigh against providing relief." This statement appears to be the product of a careless choice of words, as Fly elsewhere contends that the likelihood-of-success factor favors a stay.

Fly has not demonstrated a likelihood of success on appeal. Fly does not contend that the Court committed any legal error in its analysis. Instead, Fly's two arguments challenge the findings of fact with respect to the fourth and fifth elements of the *NBA* test. Those findings were based on record evidence as well as the Court's assessments of witness credibility at trial.[3] As outlined in the March 18 Opinion, there was considerable factual support to sustain the fourth and fifth elements of the misappropriation tort as outlined in *NBA*.

With respect to the fourth element, Fly repeats its argument at trial that the parties are not in "direct competition" because Fly is a media company and the Firms are financial services companies. This abstract observation notwithstanding, the evidence at trial showed that Fly and the Firms are, in fact, in direct competition with respect to the market at issue in this litigation: the market for disseminating equity research Recommendations. March 18 Opinion, 700 F.Supp.2d at 319–20. Fly even admitted at trial that its dissemination of the Recommendations is undertaken to assist Fly's subscribers with making investment decisions, as Fly's efforts to link its subscribers to discount brokerage services amply demonstrated. *Id.* at 339–41.[4]

With respect to the fifth element, Fly argues that the evidence at trial was insufficient to show that Fly's activities posed a "substantial threat" to the Firms' incentives to continue their investment in the production of equity research reports. In particular, Fly takes issue with the Firms' reliance on their own senior employees as fact witnesses and the absence of any expert or survey evidence at trial.[5] But the testimony of the Firms' senior executives about the operation of their businesses was utterly credible in this respect. The publication of the Recommendations by Fly and others within moments of their dissemination by the Firms has already caused the Firms to reduce substantially the resources devoted to equity research. *Id.* at 321–22, 341–43. Neither survey nor expert evidence would have provided information as direct and as compelling concerning this impact as did the testimony from the Firms' senior executives.

## B. Irreparable Harm to the Defendants

The second factor is "whether the applicant will be irreparably injured absent a stay." *Nken,* 129 S.Ct. at 1761. In the preliminary-injunction context, the Second Circuit has defined "irreparable harm" as an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Forest City Daly Hous., Inc. v. Town of N. Hempstead,* 175 F.3d 144, 153 (2d Cir.1999); *see also Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir.2009). "As a general

---

**3.** Findings of fact made following a bench trial are subject to deferential "clearly erroneous" review, while the Court of Appeals reviews *de novo* the district court's "resolution of mixed questions of fact and law." *APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.,* 592 F.3d 108, 110 (2d Cir.2010) (citation omitted); *see also Vasquez v. GMD Shipyard Corp.,* 582 F.3d 293, 297–98 (2d Cir.2009) (defining scope of "clear error" review); *Locurto v. Giuliani,* 447 F.3d 159, 176 (2d Cir.2006) (defining scope of deference for credibility judgments).

**4.** Notwithstanding its assertions that Fly and the Firms do not compete, Fly interposed a counterclaim in this action for unfair competition. The counterclaim was dismissed in the early stages of the litigation.

**5.** Fly has never explained what kind of survey would have been helpful to a fact-finder in addressing this issue.

matter, because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir.1999); *see also Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir.2003) ("To establish irreparable harm, the injury alleged 'must be one requiring a remedy of more than mere money damages.'" (citation omitted)). To weigh in favor of a stay, the applicant must demonstrate a probability of harm greater than just "some possibility of irreparable injury." *Nken*, 129 S.Ct. at 1761 (citation omitted).

Fly's allegations of irreparable harm are without sufficient factual support. As evidence, Fly offers two emails, sent March 19 and March 23, 2010, from subscribers wishing to cancel their subscriptions to Fly.[6] Fly's president, Ron Etergino, asserts in an adjoining declaration that, based on these two emails, "[c]ancellations ... are certain to become significant as time progresses, which will cause Defendant to encounter substantial adverse financial consequences." Such a prediction is not reliable in the absence of corroborative data, such as evidence of financial loss or a higher-than-usual rate of cancellations.[7] Fly is a service with many thousands of subscribers; the loss of two rep-

resents, at most, a $100 decline in monthly revenue.[8] Such a modest financial loss is not, without more, sufficient to permit a finding of irreparable harm.

Moreover, Fly's argument that it will suffer irreparable harm from the Injunction is in considerable tension with its assertion at trial that its business comprises much more than just publishing headlines about the Firms' Recommendations. The evidence at trial showed that, aside from reporting equity research recommendations, Fly also publishes headlines in nine other categories of content, including "Hot Stocks," "Rumors," "Conference/Events," "Syndicate," "Options," "General News," "Periodicals," "Technical Analysis," and "Earnings." March 18 Opinion, 700 F.Supp.2d at 323–24. The category at issue in this litigation, "Recommendations," includes research recommendations from sixty-five different investment firms, of which the Firms are only three. *Id.* Indeed, Etergino testified that only about 2.5 percent of Fly's overall output of headlines consists of the Firms' Recommendations. *Id.* at 324–25. That means that no less than 97.5 percent of Fly's reporting is wholly unaffected by the terms of the Injunction.

On its own initiative, moreover, the Court placed limitations on the Injunction to protect Fly from any unwarranted

**6.** The first email, sent March 19, 2010, stated:
I just signed up a couple of days ago and was unaware of the court ruling which may or may not be reversed, which I disagree with by the way. At this time, I am sorry but I need to cancel.
The second email, sent March 23, 2010, stated:
[D]ue to the recent court ruling, the one where you guys will be restricted from showing research from Merril [sic], [B]arclays ect [sic] .... [I] will no longer be needing your services. [P]lease cancel as of the 1st of [A]pril 2010.

**7.** The March 18 Opinion observed that "Etergino was not a reliable reporter of facts" at

trial, that he "frequently contradicted himself" in his testimony, and that he showed a "lack of attention and care in making statements" about the nature of his business. March 18 Opinion, 700 F.Supp.2d at 327 n. 25.

**8.** Fly has approximately 3,300 direct subscribers to its website and another 2,000 subscribers who access its content through licensed financial content partners. Fly offers its ten categories of content in three packages, and charges its monthly subscribers either $25 for access to one package or $50 for access to all three packages. March 18 Opinion, 700 F.Supp.2d at 324–25.

harm. It expressly permits Fly to apply within one year from the issuance of the Injunction to modify or vacate it in the event that Fly can demonstrate that the Firms have not taken reasonable steps to restrain the systematic, unauthorized misappropriation of their Recommendations.[9] *Id.* at 347–48. When the Court suggested this limitation toward the close of the trial, Fly made no objection. Indeed, unbeknownst to the Court, Fly had already offered to settle with the Firms on essentially the same terms. In January 2008, Fly offered to accept an "embargo" on its publication of "headline reports" concerning the Firms' Recommendations, provided that such an embargo included a "six month 'milestone' provision to condition the embargo provisions on plaintiffs taking action against other parties in the industry that also publish headlines concerning plaintiffs' research reports." Fly revealed to the Court the existence of its 2008 offer in a March 26, 2010 filing. This offer so closely resembles the milestone provision ultimately included in the Injunction that Fly's argument regarding irreparable harm is severely undermined.[10] Thus, the burden that the Injunction places on the Firms to police the market if they wish to stop Fly's infringement will reduce any competitive disadvantage that Fly perceives it may suffer.[11]

Finally, Fly argues that the Injunction curtails its "First Amendment rights" and, therefore, requires a *per se* finding of irreparable harm.[12] To be sure, the Second Circuit has repeatedly held, in the context of ruling on interlocutory appeals from preliminary injunctions, that "[t]he loss of First Amendment freedoms, for even minimal periods of time, normally constitutes irreparable injury." *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008) (citing *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)); *see also Kamerling v. Massanari,* 295 F.3d 206, 214–15 (2d Cir.2002). In this case, however, the First Amendment argument cannot succeed in tipping the balance toward a stay.

It is important to note at the outset that, unlike in the context of a preliminary injunction, no restraint was placed on Fly's speech until after Fly was given a full and fair opportunity to present its defenses at trial. As significantly, if Fly were truly concerned about potential encroachment upon its First Amendment rights and believed that the injunction that the Firms

9. The Injunction also explicitly permits reporting on market movement that refers to one of the Firms' Recommendations insofar as Fly's reporting is in the context of independent analytical reporting on a significant market movement that has already occurred that day. March 18 Opinion, 700 F.Supp.2d at 347–48.

10. Of course, the Injunction provides for a twelve-month "milestone" provision rather than the shorter, six-month one offered during settlement negotiations.

11. At trial there was evidence that the Firms had discussed their concerns about the misappropriation of their Recommendations with Fly's competitors, including major media outlets. March 18 Opinion, 700 F.Supp.2d at 322. In their opposition to Fly's motion, the Firms represent that they have continued those efforts since the Injunction was entered.

12. In its principal brief, Fly discusses the First Amendment only in the context of irreparable harm. In its reply brief, however, Fly indicates that it will attempt to assert a First Amendment challenge as part of its appeal of the merits. Arguments raised for the first time in a reply may not be considered when the opposing party is deprived of the opportunity to be heard as to that issue. *See, e.g., McBride v. BIC Consumer Prods. Mfg. Co., Inc.,* 583 F.3d 92, 96 (2d Cir.2009) (noting that a court "ordinarily will not consider issues raised for the first time in a reply brief"); *Joseph v. Leavitt,* 465 F.3d 87, 94 (2d Cir. 2006) ("Arguments may not be made for the first time in a reply brief." (citation omitted)).

sought would constitute "irreparable harm," it could have made that argument at trial. Instead, Fly expressly disclaimed it.[13]

■■■ The Joint Pretrial Order in this case, submitted on February 12, 2010 stated, in pertinent part:

> [T]he following affirmative defenses previously asserted by Defendant [Fly] are *not to be tried:*
>
> . . . .
>
> Defendant's publication of daily news from firms in the financial industry, including Plaintiffs, is constitutionally protected by the First Amendment to the U.S. Constitution.

(Emphasis in original.) This unequivocal statement that Fly would not raise a First Amendment defense was relied upon by the parties in preparing for trial and by the Court in its pretrial preparation, its evidentiary rulings, and its ultimate determination of liability and supporting analysis in the March 18 Opinion. Indeed, when the March 18 Opinion revealed that no First Amendment defense was considered, Fly did not move to amend the judgment or seek a new trial addressed to that defense. Consequently, Fly may not now be heard, with an appeal pending, that this Court failed to consider adequately a defense that Fly had consciously and affirmatively abandoned.[14] Similarly, because a supposed free speech defense was never tried, it cannot be concluded—as Fly does in its reply—that "[a]ll factual issues on this defense were fully addressed at trial" and, therefore, are ripe for appellate review. Fly's attempts to rewrite the history of this litigation are deeply disingenuous.

Even in the context of this stay motion, Fly has largely waited until its reply brief to explain its First Amendment defense, again depriving the Firms of any opportunity to respond. Fly argues that "[t]he First Amendment protects the news media publication of lawfully obtained information of public significance," and Fly therefore suggests that the Supreme Court's holding in *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) (*"INS"*), may be inconsistent with the First Amendment.

---

13. Fly asserts in its reply brief, falsely, that "Defendant raised the First Amendment defense in its Answer, the Summary Judgment motions, its defense of the hot-news misappropriation claims in the Pre–Trial Order and at trial." It is true that, in its Answer, Fly asserted an affirmative defense that "[d]efendant's publication of such daily news from firms in the financial industry, including plaintiffs, is an acceptable and necessary function in the life of the financial community that is constitutionally protected by the *First Amendment*" (emphasis in original). Thereafter, however, Fly never again asserted a First Amendment defense to the Firms' misappropriation claims. To the extent that the First Amendment was implicated on summary judgment, it was in the context of Fly's assertion of a fair use defense to copyright infringement. Fly did not again raise the First Amendment as a defense to misappropriation until this stay motion.

14. "The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, waiver will bar raising the issue on appeal." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir.2008) (citation omitted) (*"Nortel"*). To be sure, the Court of Appeals does "have discretion to consider waived arguments in order to avoid a manifest injustice or where a question of law is at issue and there is no need for additional factfinding." *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 111 n. 10 (2d Cir.2010). The Court of Appeals has made clear, however, that "the circumstances normally do not militate in favor of an exercise of discretion to address new arguments on appeal where those arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below." *Nortel*, 539 F.3d at 133 (citation omitted).

Even then, however, its argument is sketchy and fails to engage with pertinent Second Circuit and Supreme Court authority.[15] The Supreme Court has indicated that the Government's interest in "eliminating restraints on fair competition is always substantial, even when the individual or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Indeed, "the exchange of information about securities" is explicitly cited by the Court as an example of the kinds of communications that may be "regulated without offending the First Amendment." *Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.*, 551 U.S. 291, 297, 127 S.Ct. 2489, 168 L.Ed.2d 166 (2007) (citation omitted). Other pertinent Supreme Court authorities, several of which cite *INS* and rely upon its fair-competition rationale, include *Carpenter v. United States*, 484 U.S. 19, 25–26, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 541, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556–59, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), and *Zacchini v. Scripps–How-*

*ard Broad. Co.*, 433 U.S. 562, 578, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). Moreover, the Court of Appeals recently decided a case involving a news organization's claim that it had a First Amendment right to report on public matters even where such conduct infringed applicable competition and intellectual property laws. Reversing and remanding the district court, the Court of Appeals stressed that "the First Amendment does not provide news entities an exemption from compliance with intellectual property laws." *Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 489 F.3d 474, 481 (2d Cir.2007). While the aforementioned cases and principles may or may not apply here—and this Court reaches no conclusion about whether they do, given Fly's failure to raise a First Amendment defense at trial—it is instructive that Fly has not addressed them whatsoever in its application for a stay.

## C. Potential Harm to the Plaintiffs

The third factor requires an inquiry as to "whether issuance of the stay will substantially injure the other parties interested in the proceeding." *Nken*, 129 S.Ct. at 1761. Fly asserts that the Firms will suffer no harm from a stay because Fly seeks

---

**15.** Fly cites *dicta* from three Supreme Court cases: *Eldred v. Ashcroft*, 537 U.S. 186, 219, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003), *Bartnicki v. Vopper*, 532 U.S. 514, 527–28, 533–35, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2000), and *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103–06, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979). Those cases do not support the proposition to which Fly seeks to apply them. *Eldred* concerned the constitutionality of a federal statute that extended the term of protection for existing copyrighted works, while *Bartnicki* and *Smith* concerned the relationship under the First Amendment between the news media's interest in reporting about important public events and individuals' rights to privacy.

Fly also relies upon *dicta* from *NBA* stating that if a work "is in the public domain, then its use would not be wrongful." *NBA*, 105 F.3d at 845 (quoting *Fin. Info., Inc. v. Moody's Investors Serv., Inc.*, 808 F.2d 204, 208 (2d Cir.1986) ("*FII*")). To the extent that Fly, citing *FII*, claims that it reports only information in the "public domain," Fly is arguing for a certain legal conclusion (i.e., for no liability) rather than making an observation that informs the questions at issue. The phrase "public domain" does not carry the meaning that Fly supposes, namely, that an item is legally in the "public domain" if it has been made widely available. If this were true, every copyrighted work sold in the marketplace would have entered the public domain and lost protection.

only to "maintain[ ] the *status quo* that plaintiffs have acquiesced in for at least a decade." Fly also continues to imply that it was unfairly singled out by the Firms as a subject of litigation.

Fly's arguments do not suffice to demonstrate that the Firms would not be substantially injured by a stay. The evidence at trial showed that the Firms are prejudiced by the unauthorized and systematic publication of their Recommendations.[16] That substantial harm was essentially one of the elements that the Firms had to prove at trial: the fifth *NBA* element is that "the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened." *NBA*, 105 F.3d at 841. The burden of proof now rests on Fly—and *not* on the Firms—to prove that Fly's conduct does not cause "substantial harm." Fly has not met its burden of proving that its incremental role in re-circulating, to its own subscriber audience, the Firms' Recommendations would not cause further substantial harm to the Firms.

Instead of squarely addressing this narrow question, Fly seeks to shift the attention to other considerations. For example, Fly asserts, for the first time, that "[a]lthough defendant was one of the early online financial services to report Wall Street recommendations, it was by no means the first in this field." Fly did not provide evidence to that effect at trial. Rather, the proof at trial established that Fly was one of the first to engage in the systematic misappropriation of the Firms' Recommendations and one of the most ardent and successful early practitioners of that misappropriation. March 18 Opinion, 700 F.Supp.2d at 337–39. Fly's core business in its early years—and the heart of its marketing campaign to this day—is its free-riding off the research done by the Firms and other financial institutions. *Id.* at 322–23, 336–37. In any event, Fly has not explained why these historical facts are relevant to a consideration of whether the Firms will suffer "substantial harm" going forward. In sum, Fly has not proffered evidence sufficient to enable the inference that the Firms would not suffer substantial harm if the Injunction were vacated or modified pending appeal.

### D. Public Interest

The fourth and final factor requires a consideration of "where the public interest lies." *Nken*, 129 S.Ct. at 1761. On this factor, Fly asserts that "issues of federal preemption are implicated by the injunction which extends to noncopyrightable aspects of plaintiffs' Recommendations." [17]

Fly's argument is entirely without merit. The precise question addressed by the Second Circuit in *NBA* was whether a state-law claim for misappropriation of noncopyrightable material could survive preemption under the Copyright Act, and if so, to what extent. The Second Circuit explicitly held that a narrow, five-element tort of "hot-news misappropriation" does survive such preemption. That is the very tort that was litigated in this case, and Fly did *not* argue at trial that *NBA* was incorrectly decided.

---

16. Because of this litigation, Fly began waiting for two or three other sources to publish the Firms' Recommendations before it would publish them, which still typically occurred before the market opening. March 18 Opinion, 700 F.Supp.2d at 325–28.

17. Fly cites an influential article by Judge Posner of the Seventh Circuit observing that there is "a deliberate federal policy to preserve a public domain consisting of the noncopyrightable contents (such as facts and ideas) of copyrightable works." Richard A. Posner, *Misappropriation: A Dirge*, 40 Hous. L.Rev. 621, 631 (2003).

As significantly, Fly conceded at trial that equity research in general, and by the Firms in particular, is a valuable social good. March 18 Opinion, 700 F.Supp.2d at 343–44. The Injunction was designed to preserve the incentive for the Firms to create equity research and to spread the benefits of that research to all investors while protecting legitimate news reporting. *Id.* at 345–46.

## II. Fly's Alternative Application for Modification of the Injunction

In the alternative, Fly requests that the Injunction be modified so that Fly may report on the Firms' Recommendations as soon as they have been published by a mainstream news service. Fly does not offer any additional argument or evidence in support of this alternative application.

Fly's alternative application cannot succeed. First, Fly has not supplied any argument or evidence showing why the four-factor *Nken* test favors this application and has not explained what, if any, deficiencies in the Injunction would be addressed by the proposed modification. Second, Fly's concerns about being faced with a potential competitive disadvantage by the ability of other services to continue publishing the Firms' Recommendations have already been addressed by the one-year milestone provision contained in the Injunction. If the Firms do not demonstrate that they are enforcing their rights against other unauthorized re-publishers of their Recommendations, the Injunction may be modified or vacated at that time.

### CONCLUSION

Fly's April 13, 2010 motion for a stay or modification of the March 18, 2010 Injunction pending appeal is denied.

SO ORDERED.